The **MUNICIPAL UTILITIES BD. OF ALBERTVILLE; The City of Alexander City; The City of Andalusia; The City of Bessemer; The City of Brundidge; The City of Courtland; The Utilities Board of the City of Cullman, Inc.; The City of Decatur; The City of Dothan; The City of Evergreen; The City of Fairhope; The City of Florence; The Utilities Board of the City of Foley; The Fort Payne Improvement Authority; The Electric Board of Guntersville; The City of Hartford; The Electric Board of the City of Hartselle; The City of Huntsville; The City of Lafayette; The City of Lanett; The Electric**

---

**15.** *See Nason v. Commissioner,* 48 T.C.M. (CCH) 1300, 1301 (1984).

**16.** *See Jasionowski v. Commissioner,* 66 T.C. 312, 318 (1976).

Board of the City of Luverne; The Electric Board of the City of Muscle Shoals; The City of Opelika; The Utilities Board of the City of Opp; The City of Piedmont; The City of Robertsdale; The Scottsboro Electric Power Board; The Utilities Board of the City of Sylacauga; The City of Tuscumbia and The Utilities Board of the City of Tuskegee, Plaintiffs–Appellants,

City of Lincoln, Alabama, a municipal corp., Applicant for Intervention–Appellant,

v.

ALABAMA POWER COMPANY; The Alabama Rural Electric Association of Cooperatives; Dixie Electric Cooperative; Covington Electric Cooperative, Inc.; Marshall–DeKalb Electric Cooperative; Southern Pine Electric Cooperative; Cherokee Electric Cooperative; Cullman Electric Cooperative; Pioneer Electric Cooperative, Inc.; Tombigbee Electric Cooperative, Inc.; Wiregrass Electric Cooperative, Inc.; Joe Wheeler Electric Membership Corporation; Clarke–Washington Electric Membership Corporation; Tallapoosa River Electric Cooperative; Pea River Electric Cooperative; Central Alabama Electric Cooperative; Sand Mountain Electric Cooperative; Franklin Electric Cooperative; North Alabama Electric Cooperative; Baldwin County Electric Membership Cooperation; Coosa Valley Electric Cooperative, Inc.; South Alabama Electric Cooperative, Inc.; Black Warrior Electric Membership Corporation; Arab Electric Cooperative, Inc. and Alabama Electric Cooperative, Inc., Defendants–Appellees.

No. 90–7095.

United States Court of Appeals, Eleventh Circuit.

March 11, 1991.

Robert D. Thorington, Wendell Cauley, Johnson & Thorington, Montgomery, Ala., George G. Lynn, Maynard, Cooper, Frierson & Gale, P.C., Birmingham, Ala., Robert A. Jablon, Barbara Esbin, Spiegel & McDiarmid, Washington, D.C., for plaintiffs-appellants.

Charles M. Crook, John Mandt, Balch & Bingham, Montgomery, Ala., for Alabama Power Co.

H.A. Lloyd, Lloyd, Dinning, Boggs & Dinning, Demopolis, Ala., for Black Warrior Elec. Membership Corp.

Edward M. Price, Jr., Farmer, Price, Smith, Hornsby & Weatherford, Dothan, Ala., for Wiregrass Elec. Co-op., Inc.

George C. Douglas, Jr., Gaines, Gaines & Gaines, Talladega, Ala., for Coosa Valley Elec.

Robert A. Huffaker, Rushton, Stakely, Johnston & Garrett, Montgomery, Ala., for All Cooperatives.

Before JOHNSON and HATCHETT, Circuit Judges, and DYER, Senior Circuit Judge.

JOHNSON, Circuit Judge:

The plaintiffs, thirty municipal and public corporations and their boards ("the Cities"), appeal the district court's order dismissing with prejudice their antitrust complaint against twenty-two rural electric cooperatives ("the Cooperatives"), the Alabama Rural Electric Association of Cooperatives ("AREA") and Alabama Power Company ("APC").

## I. STATEMENT OF THE CASE

### A. *Background Facts*

The Cities, the Cooperatives, and APC all own and operate electric distribution facilities in the State of Alabama. In 1979, the Alabama Legislature established the Joint Interim Committee on Electricity ("the Committee") to develop legislation "to avoid wasteful, uneconomic duplication of electric facilities, the cost of which must be borne by the consumer." 1979 Ala. Acts 764.[1] In 1984, the Legislature passed the Service Territories for Electric Suppliers Act ("the 1984 Act") for the stated purpose of limiting wasteful line duplication. Ala. Code § 37–14–1 (Supp.1989). The 1984 Act assigned service territories to Alabama's

---

1. The Alabama Legislature instructed the Committee to develop this legislation in consultation with the three principal distributors of electricity in the state, investor owned utilities, rural electric cooperatives, and municipal electric systems, *e.g.*, APC, the Cooperatives, and the Cities. 1979 Ala. Acts 764.

electric suppliers. This legislation was subsequently held invalid by a federal district court and enjoined from enforcement.[2] In 1985, the Legislature passed a second Service Territories for Electric Suppliers Act ("the 1985 Act") in an effort to accommodate the constitutional questions raised by the district court. Ala.Code § 37–14–33 (Supp.1989).[3]

The 1984 and 1985 Acts (collectively "the Acts") established three sets of rules: (1) those governing activities outside existing city limits (*i.e.*, city boundaries as of April 26, 1984); (2) those governing activities inside existing city limits; and (3) those governing special situations.

The rules governing service outside existing city limits provided that electric suppliers could not service premises already served by another supplier. Ala.Code §§ 37–14–3, 37–14–32 (Supp.1989). These rules also stated that electric suppliers could not extend their facilities to service new premises located in the service area of another supplier, except for industrial customers whose electric load exceeded 2500 kilowatts. *Id.* The Acts also adopted detailed rules to assign specific service areas to each supplier. Ala.Code §§ 37–14–3, 37–14–32 (Supp.1989). Finally, the Acts prohibited a municipality from serving any customers outside its boundary, even if the city annexed new territory. *Id.*

The rules governing service inside city limits allowed the "primary electric supplier" to purchase the facilities of other suppliers within "existing municipal limits" on terms specified in the statute. *Id.* If the primary supplier elected not to purchase these facilities, the statute permitted the secondary supplier to maintain these facilities and become the assigned supplier to those new customers which locate "closer to" its lines. *Id.*

The Acts also contained certain "special rules." Ala.Code §§ 37–14–7, 37–14–36 (Supp.1989). These rules incorporated into the Acts certain listed agreements that had been reached previously by electric suppliers and recognized by the Alabama Public Service Commission (the "APSC"). These agreements governed the prevention of line duplication in the areas they covered. The Acts prohibited changing these agreements without the approval of the Legislature. *Id.*

### B. *Procedural History*

On May 19, 1989, the Cities filed an antitrust complaint seeking declaratory and injunctive relief and damages against the defendant Cooperatives, AREA, and APC (collectively, "the defendants") for conspiring to suppress competition in the retail electric market in violation of the Sherman Act, 15 U.S.C.A. §§ 1, 2 (West 1990), and the Clayton Act, 15 U.S.C.A. § 26 (West 1990). The Cities alleged that the defendants had illegally agreed to divide service territories horizontally and had conspired with members of the Alabama Legislature and Government to immunize this antitrust violation by codifying this illegal agreement as the Acts. The complaint challenged all of the defendants' actions associated with this agreement, including their efforts to pass the Acts and any actions the defendants had taken pursuant to the Acts.

On June 12, 1989, APC, AREA, and nineteen of the Cooperatives moved to dismiss the complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6). Specifically, they argued that they were immune from antitrust liability under the *Noerr–Pennington* and state action doctrines. APC also argued that the Cities' claims were time-barred because both Acts were passed more than four years prior to the commencement of the action. On June 14, 1989, Coosa Valley Electric Cooperative

**2.** This Court subsequently found that this case had been wrongfully removed to federal court, and we vacated the district court's judgment. *Dixie Elec. Coop. v. Citizens of Ala.*, 789 F.2d 852 (11th Cir.1986). The Alabama Supreme Court then held that both Acts were valid. *Alabama Power Co. v. Citizens of Ala.*, 527 So.2d 678 (Ala.1988).

**3.** Both the 1984 Act and the 1985 Act (collectively "the Acts") apparently remain in force. With a few minor exceptions, however, those provisions of the 1985 Act that are inconsistent with the 1984 Act have been repealed. Ala.Code §§ 37–14–1, 37–14–40 (Supp.1989).

("Coosa Valley") also moved to dismiss, arguing that the Cities lacked standing to assert a cause of action under 15 U.S.C.A. § 15 (West 1990). On August 11, 1989, the City of Lincoln, Alabama, moved to intervene.

On January 9, 1990, following oral argument, the district court granted the motions to dismiss and denied Lincoln's motion to intervene. The court held that the Cities lacked standing to bring claims for any alleged antitrust injury occurring outside the service areas assigned to them by the Acts, but had standing to bring claims for such injuries within their service areas. Nevertheless, the court dismissed these latter claims, holding that the allegedly actionable conduct was immune from antitrust liability under the *Noerr–Pennington* and state action doctrines.

## II. ANALYSIS

### A. *Dismissal of the Cities' Claims*

When reviewing a district court's order dismissing a complaint pursuant to Fed.R. Civ.P. 12(b)(6), this Court will presume the allegations of the complaint are true and liberally construe the complaint in the plaintiff's favor. *Burch v. Apalachee Community Mental Health Servs., Inc.,* 840 F.2d 797, 798 (11th Cir.1988) (en banc), *aff'd sub nom.,* — U.S. —, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). A motion to dismiss will be denied " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief.' " *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

Notice pleading is all that is required for a valid antitrust complaint. *Quality Foods de Centro America, S.A. v. Latin Am. Agribusiness Dev. Corp.,* 711 F.2d 989, 995 (11th Cir.1983). A plaintiff must plead sufficient facts so that each element of the alleged antitrust violation can be identified. Conclusory allegations "will not survive a motion to dismiss if not supported by facts constituting a legitimate claim for relief.... However, the alleged facts need not be spelled out with exactitude, nor

must recovery appear imminent." *Id.* (citations omitted).

### 1. Dismissal Under the State Action Doctrine

 The district court held that the defendants enjoyed state action immunity for their actions taken pursuant to the Acts and therefore dismissed the Cities' claims relating to these actions. The Cities contend that the defendants' actions do not qualify for state action immunity for two reasons. First, they argue that they have alleged an illegal conspiracy between public officials and the defendants which therefore removes state action immunity from the defendants' actions. Second, the Cities claim that the Acts are facially invalid because the Acts fail to comply with either prong of the test for state action immunity set forth in *California Retail Liquors Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980), and therefore the Acts violate the Sherman Act. We will address the Cities' arguments in reverse order.

In *Parker v. Brown,* 317 U.S. 341, 351, 63 S.Ct. 307, 313–14, 87 L.Ed. 315 (1943), the Supreme Court held that Congress did not intend the Sherman Act to prevent state action restraining competition. A state statute restraining competition is not preempted by the Sherman Act provided: (1) the challenged state statute was implemented pursuant to a clearly articulated state policy restraining competition; and (2) the policy was actively supervised by the state. *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943. The supervision prong prevents a state from frustrating the national policy in favor of competition by casting a shadow of state involvement over what is essentially private anticompetitive conduct. *Id.* at 106, 100 S.Ct. at 943–44. State action taken pursuant to state legislation which satisfies the *Midcal* test is immune from antitrust liability. *Id.* at 105, 100 S.Ct. at 943. The *Midcal* test is also applicable to private party claims for state action immunity, such as the claim made by the defendants here. *Southern Motor Carriers Rate Conference v. United*

*States,* 471 U.S. 48, 61, 105 S.Ct. 1721, 1728–29, 85 L.Ed.2d 36 (1985).

Our first inquiry is to determine whether the Acts satisfy the *Midcal* test and are therefore exempt from the provisions of the Sherman Act. The Alabama Legislature has clearly articulated a policy to displace competition in the retail electric market other than for large industrial customers with a system of competition. *See* Ala. Code §§ 37–14–1, 37–14–30 (reducing the costs of line duplication warranted regulation). Accordingly, the Acts meet *Midcal's* first prong.

The second prong of the *Midcal* test requires active state supervision over any private anticompetitive conduct taken pursuant to the regulatory scheme. *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943. The district court found that the Acts strictly controlled the assignment of service areas to electric providers and left no room for private discretion in the assignment of service areas. It also noted that private parties may agree to depart from the assignments designated by the Acts but only if such agreements are presented to and approved by the Alabama Legislature before being implemented. Ala.Code § 37–14–8. The court concluded that Alabama had actively supervised all private behavior taken pursuant to the Acts.[4]

The Cities contend that the Acts fail to meet the supervision prong of *Midcal* because they fail to provide state agency supervision over the Acts or a method for resolving potential disputes over such issues as which electric supplier serves customers at territorial boundary lines. They further point out that the Alabama Legislature failed to provide for any supervision of the private agreements incorporated into the Acts, *see* Ala.Code §§ 37–14–8, 37–14–36, and argue that this omission also violates the supervision prong of *Midcal.*

■ The purpose of the supervision prong is to ensure that private anticompetitive conduct promotes state policy rather than simply the interests of private parties. *Patrick v. Burget,* 486 U.S. 94, 101, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988). In determining whether state legislation satisfies the supervision prong, the Supreme Court has focused its inquiry on whether private parties or public authorities made the operative decisions regarding the challenged anticompetitive conduct. The Court has consistently held that state statutes which grant private actors " 'a degree of private regulatory power' " violate the Sherman Act and do not qualify for state action immunity. *Fisher v. City of Berkeley,* 475 U.S. 260, 269, 106 S.Ct. 1045, 1050–51, 89 L.Ed.2d 206 (1986) (quoting *Rice v. Norman Williams Co.,* 458 U.S. 654, 665, 102 S.Ct. 3294, 3302, 73 L.Ed.2d 1042 (1982) (Stevens, J., concurring)); *see also Patrick,* 486 U.S. at 101, 108 S.Ct. at 1663 (holding hospital peer-review committees failed supervision prong because private parties exercising decision-making authority were not subject to state supervision); *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943 (holding that statute that authorized price setting by private parties and then enforced those prices failed the supervision prong).

In the instant case, the Alabama Legislature has made all of the decisions being challenged by the Cities in this litigation, *e.g.,* to divide service territories inside and outside of municipal limits and to limit competition for large industrial customers of electricity. The Acts have placed no decision-making authority in the hands of private parties over restraints on competition in the retail electricity market in Alabama. Rather, the Acts eliminate virtually all discretionary behavior by retail electric suppliers outside of their service territories and therefore attempt to ensure that all actions taken by the suppliers pursuant to the Acts will serve policy goals of the Acts.[5] The

---

4. The court did note that the Acts give primary suppliers in every municipality the discretion to purchase the distribution facilities of any secondary suppliers within the municipality. The terms and conditions of such purchases are strictly regulated. *See* Ala.Code § 37–14–4.

5. The principal discretion left to electric suppliers is the decision by a primary supplier within existing city limits to purchase the facilities of other suppliers within those city limits on terms specified in the Acts. Ala.Code §§ 37–14–3, 37–14–32 (Supp.1989). Of course, electric suppliers retain their discretionary authority over the nor-

Acts reflect not only the Alabama Legislature's decision to limit competition in Alabama's retail electric market by dividing the state into service territories; they also set forth the Alabama Legislature's determination as to means by which such division shall be accomplished. Unlike the defendants in *Patrick, supra*, or *Midcal, supra*, the defendants in this litigation do not exercise any private regulatory power. Accordingly, the Acts fulfill both prongs of the *Midcal* test and are exempt from the Sherman Act.

This conclusion is supported by the decision in *Fisher v. City of Berkeley*, 475 U.S. at 260, 106 S.Ct. at 1045. In *Fisher*, the plaintiffs challenged a city ordinance imposing rent ceilings on residential real property as constituting price fixing in violation of the Sherman Act. The Supreme Court held that, because the rent ceilings were imposed by the city and not by private parties, the restraint was not concerted action within the meaning of the Sherman Act. *Id.* at 268–69, 106 S.Ct. at 1050–51. Of course, the Acts challenged in this litigation divide market territories instead of imposing price ceilings. Like *Fisher*, however, the operative decisions were made by government officials not private actors. *See also Morgan v. Division of Liquor Control*, 664 F.2d 353, 356 (2nd Cir.1981) (holding that a state statute regulating liquor prices by imposing a minimum mark-up that left little or no discretion to private parties satisfied the supervision prong of *Midcal*).

The Cities also argue that by passing the Acts the Alabama Legislature merely "rati-

fied" a private anticompetitive agreement among the defendants. They argue that *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), stands for the proposition that the state action doctrine does not permit a state to immunize unlawful private anticompetitive conduct by passing a law declaring it legal.

The Supreme Court has long recognized that the state action doctrine does not permit a state to frustrate the national policy in favor of competition by casting a shadow of state involvement over what is essentially private anticompetitive conduct. *Midcal*, 445 U.S. at 106, 100 S.Ct. at 943–44. The Court has developed the two-prong *Midcal* test precisely for this reason—to ensure that state legislation that restrained competition actually qualified for state action immunity because that legislation furthered state goals and not merely private interests. *Id.* As discussed above, the Acts meet the *Midcal* test. Accordingly, the Cities' ratification argument fails.

■ The Cities also argue their complaint alleged sufficient facts to trigger a "public co-conspirator" exception to the state action doctrine. Specifically, the Cities claim that the defendants entered into a private anticompetitive agreement which, through a conspiracy with unnamed members of the Alabama Legislature and Alabama Government, they caused to be enacted into legislation as the Acts.

This Court has not expressly recognized a public co-conspirator exception to the state action doctrine.[6] More importantly, beyond the existence of the Acts them-

---

mal operating decisions necessary to service customers within their territories.

**6.** In their brief, the Cities substantially overstated this Court's holdings in *Commuter Transp. Sys., Inc. v. Hillsborough County Aviation Auth.*, 801 F.2d 1286 (11th Cir.1986), and *Greyhound Rent–A–Car, Inc. v. City of Pensacola*, 676 F.2d 1380 (11th Cir.1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983). These cases stand for the principle that public officials who engage in "a conspiracy not authorized by state law [restraining competition] ... are beyond the protection of state action immunity." *Commuter Transp. Sys.*, 801 F.2d at 1291. While this principle may provide

some implicit support for a public co-conspirator exception, it is hardly the express recognition of such an exception claimed by the Cities. The Fourth Circuit has expressly recognized a public co-conspirator exception to the state action doctrine. *Omni Outdoor Advertising, Inc. v. Columbia Outdoor Advertising, Inc.*, 891 F.2d 1127, 1133–34 (4th Cir.1989), *cert. granted*, —— U.S. ——, 110 S.Ct. 3211, 110 L.Ed.2d 659 (1990); *see also Affiliated Capital Corp. v. City of Houston*, 735 F.2d 1555 (1984) (en banc), *cert. denied*, 474 U.S. 1053, 106 S.Ct. 788, 88 L.Ed.2d 766 (1986); *Westborough Mall, Inc. v. City of Cape Gerardean*, 693 F.2d 733, 746 (8th Cir. 1982), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2122, 77 L.Ed.2d 1303 (1983).

selves, the Cities allege no facts which describe this supposed private anticompetitive agreement or the underlying conspiracy between the defendants and Alabama public officials. The Cities' complaint merely consists of the conclusory allegation that the passage of the Acts alone raises a sufficient claim that the defendants entered into an illegal anticompetitive agreement and conspired with government officials to have that agreement enacted into law. By failing to plead facts describing any wrongful acts by Alabama public officials involved in passing the Acts, *e.g.*, bribery, conflict of interest, the Cities have failed to provide the defendants with notice sufficient to identify an antitrust violation. *Quality Foods*, 711 F.2d at 995. A conclusory allegation of anticompetitive conduct will not survive a motion to dismiss. *Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir.1985). The Cities' complaint alleged insufficient facts to trigger a public co-conspirator exception to the state action doctrine.

### 2. Dismissal Under Noerr–Pennington

The district court also dismissed with prejudice those claims by the Cities based on the defendants' allegedly anticompetitive conduct prior to the passage of the Acts. The court reasoned that the defendants' actions were immune from antitrust liability under the *Noerr–Pennington* doctrine because the Cities failed to allege any facts to suggest that defendants' actions consisted of anything besides petitioning the Alabama Legislature to pass the Acts.

The Cities argue that, as with their challenge to the defendants' claim for state action immunity, they have alleged sufficient facts to trigger a "ratification exception" and a "public co-conspirator" exception to the *Noerr–Pennington* doctrine. The Cities therefore claim that the district court erred in dismissing their claims.

■ Joint efforts among competitors to restrain or monopolize trade by petitioning government officials are immune from antitrust liability under the *Noerr–Pennington* doctrine. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499, 108 S.Ct. 1931, 1936, 100 L.Ed.2d 497 (1988) (citing *Eastern RR President's Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 669–672, 85 S.Ct. 1585, 1592–1595, 14 L.Ed.2d 626 (1965)). The boundaries of this protection are determined by "the source, context, and nature of the anticompetitive restraint at issue." *Id.* When a restraint on trade " 'is the result of valid governmental action, as opposed to private action,' those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint." *Id.* (quoting *Noerr*, 365 U.S. at 136, 81 S.Ct. at 529).

■ This Court has not recognized a ratification exception to the *Noerr–Pennington* doctrine. Moreover, such an exception would likely swallow the rule. It would permit the losers of legislative battles to claim that any coordination by their successful opponents amounted to a prior agreement which was then "ratified" by the legislature. If the *Noerr–Pennington* doctrine is to have any effect, plaintiffs cannot be allowed to use the mere existence of state legislation to restrain trade to bootstrap an antitrust claim against the supporters of that legislation.[7]

■ The Cities also claim that the defendants' actions fall within the public co-conspirator exception to *Noerr–Pennington* doctrine. This Court affirmed, *per curiam* after oral argument, a district court's order that the evidence must show "true complic-

---

**7.** The Supreme Court's holding in *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), does not support the Cities' claim of a ratification exception to the *Noerr–Pennington* doctrine. In *Allied Tube*, the conduct at issue was an attempt to influence a private standard setting organization to draft codes, which were frequently adopted by state governments, that would exclude the plaintiff. This action did not qualify for protection under *Noerr–Pennington* because the defendants were not attempting to influence the government. *Allied Tube*, 486 U.S. at 504, 108 S.Ct. at 1939. In the instant case, the Cities challenge the defendants' conduct directly petitioning the Alabama Legislature.

ity" to satisfy the public co-conspirator exception. *Sherman College of Straight Chiropractic v. American Chiropractic Ass'n., Inc.,* 654 F.Supp. 716, 728 (N.D.Ga. 1986), *aff'd,* 813 F.2d 349 (11th Cir.), *cert. denied,* 484 U.S. 854, 108 S.Ct. 160, 98 L.Ed.2d 114 (1987). *Sherman College* questioned the broad scope of the public co-conspirator exception recognized by the Third Circuit in *Duke & Co. v. Foerster,* 521 F.2d 1277 (3rd Cir.1975), a case on which the Cities rely heavily. *Id.* at 725; *see also First Am. Title Co. v. South Dakota Land Title Ass'n,* 714 F.2d 1439, 1446 (8th Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984) (refusing to rely on the *Duke* co-conspirator exception). The public co-conspirator exception is limited to those cases where a government official or government body has been influenced by some corrupt means. *See Video Int'l Prod., Inc. v. Warner–Amex Cable Communications, Inc.,* 858 F.2d 1075, 1083 (5th Cir.1988), *cert. denied,* 491 U.S. 906, 109 S.Ct. 3189, 105 L.Ed.2d 697 (1989).[8]

■■■ As noted above, the Cities' complaint neither identified a single legislator or member of the Alabama government as a participant in the alleged conspiracy nor alleged that the defendants used bribery or other corrupt means to influence the Alabama Legislature. The Cities have merely alleged that members of the Alabama Legislature or the Alabama government "acted in concert" with the defendants. A legislator's agreement to support a constituent's interest in proposed legislation does not render that legislator a co-conspirator under the *Noerr–Pennington* doctrine. *See Metro Cable Co. v. CATV of Rockford, Inc.* 516 F.2d 220, 230 (7th Cir.1975); *see also Boone v. Redevelopment Agency of San Jose,* 841 F.2d 886, 895 (9th Cir.), *cert. denied,* 488 U.S. 965, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988) (holding *Noerr–Pennington* cannot be circumvented merely by alleging that a government official was involved in the alleged conspiracy). Accordingly, the district court prop-

erly concluded that the Cities' allegations, as presently set forth in their complaint, are insufficient to trigger the public co-conspirator exception to the *Noerr–Pennington* doctrine.

■■■ For the foregoing reasons, we concur with the district court's judgment that the Cities' present complaint fails to allege sufficient facts to survive a motion to dismiss. We note, however, that "a district court's discretion to dismiss a complaint without leave to amend is 'severely restrict[ed]' by Fed.R.Civ.P. 15(a), which directs that leave to amend 'shall be freely given when justice so requires.'" *Thomas v. Town of Davie,* 847 F.2d 771, 773 (11th Cir.1988) (quoting *Dissouy v. Gulf Coast Inv. Corp.,* 660 F.2d 594, 597 (5th Cir. 1981)). Absent a substantial reason to deny leave to amend, a district court's discretion is not sufficiently broad to permit denial. *Id.* We agree with the district court that the Acts on their face meet the requirements of *Midcal* and therefore qualify for antitrust immunity under the state action doctrine. The district court erred, however, in dismissing the Cities' complaint with prejudice without first giving the Cities' leave to amend their complaint to allege sufficient facts to support their allegations of an illegal conspiracy between the defendants and Alabama public officials and thereby trigger the public co-conspirator exception to the state action doctrine.

### B. *Standing*

■■■ In its order below, the district court found that the Cities lacked standing to assert claims for alleged antitrust injuries occurring outside the service areas assigned to them under the Acts, but had standing to bring claims for such injuries within their statutory service areas. The court reasoned that the Cities' authority to engage in retail electricity sales derived solely from a delegation of state power by the Alabama Legislature. The court held that the Cities could suffer no antitrust injury from any allegedly anticompetitive

---

**8.** *Video Int'l* limited the holding of *Affiliated Capital Corp. v. Houston,* 735 F.2d 1555 (5th Cir.1985) (en banc), the case on which the Cities rely most heavily.

acts outside their statutory service areas because the Alabama Legislature had not granted the authority to compete in those areas. The court noted that the Sherman Act did not limit the Alabama Legislature's authority to restrain or retract this delegation. In this appeal, the Cities contend that they have standing to challenge any allegedly anticompetitive acts even if these acts occurred outside their service areas.

Section 4 of the Clayton Act creates a federal cause of action available to "[a]ny *person* who shall be injured in his business or property by reason of anything forbidden in the antitrust laws...." 15 U.S.C.A. § 15 (West Supp.1990) (emphasis added). To acquire standing under the Act, a plaintiff must meet four criteria: (1) the complainant must be a "person"; (2) the complaint must allege an actual injury; (3) the injury must be of a commercial nature; and (4) the injury suffered must be an antitrust injury, *e.g.*, an injury that Congress intended the antitrust laws to prevent and that resulted from the defendants' allegedly illegal conduct. *Amey, Inc. v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486, 1492–93 (11th Cir.1985), *cert. denied,* 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986). Standing to pursue an antitrust claim requires more than constitutional standing. The Court must find a close relationship between the Cities' injury and the alleged antitrust violation. *Id.* at 1493.

To determine whether the Cities have standing, we must apply the four-part test set forth in *Amey,* 758 F.2d at 1492–93. First, the Cities are persons within the meaning of the Sherman Act. *See City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 395, 98 S.Ct. 1123, 1127–28, 55 L.Ed.2d 364 (1978). Second, the Cities have alleged that the Acts codify preexisting anticompetitive agreements that deprive them of the opportunity to compete for future customers.

This injury certainly falls within the class of injuries which the Sherman Act sought to protect against, *e.g.*, a conspiracy to engage in anticompetitive conduct by rival retail electric suppliers. *See*

*Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). There is a close relationship between the Cities' claimed injury and the alleged antitrust violation; the Acts limit the Cities' ability to compete for future customers. The district court noted correctly that the Sherman Act does not limit the Alabama Legislature's authority to retract its permission to the Cities to compete in the provision of electrical power. A state may not, however, immunize essentially private anticompetitive conduct from antitrust liability merely by covering it with the "gauzy cloak of state involvement." *Midcal,* 445 U.S. at 106, 100 S.Ct. at 943. Because the Cities claim that the Acts represent an attempt by the State of Alabama to immunize the defendants' anticompetitive agreement, they have standing to challenge defendants allegedly anticompetitive actions regardless of where they occur in Alabama.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's order dismissing the Cities' complaint with prejudice and REMAND with instructions to GRANT the Cities leave to amend. Because the City of Lincoln's claim rests on the same facts as the Cities' claim, we REVERSE the district court's order denying the City of Lincoln's motion to intervene.