# PATRICK *v.* BURGET ET AL.

No. 86–1145.   Argued February 22, 1988—Decided May 16, 1988

MARSHALL, J., delivered the opinion for the Court, in which all other Members joined, except BLACKMUN, J., who took no part in the consideration or decision of the case.

*Barbee B. Lyon* argued the cause for petitioner. With him on the brief was *Don H. Marmaduke.*

*Thomas M. Triplett* argued the cause and filed a brief for respondents.*

JUSTICE MARSHALL delivered the opinion of the Court.

The question presented in this case is whether the state-action doctrine of *Parker* v. *Brown,* 317 U. S. 341 (1943), protects physicians in the State of Oregon from federal antitrust liability for their activities on hospital peer-review committees.

### I

Astoria, Oregon, where the events giving rise to this lawsuit took place, is a city of approximately 10,000 people

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Rule, Deputy Solicitor General Cohen, Deputy Assistant Attorney General Starling, Roy T. Englert, Jr., Robert B. Nicholson, Laura Heiser,* and *Robert D. Paul;* for the American Psychological Association by *Donald N. Bersoff* and *David W. Ogden;* and for the Association of American Physicians & Surgeons, Inc., et al. by *Russell Iungerich* and *Kent Masterson Brown.*

Briefs of *amici curiae* urging affirmance were filed for the American Medical Association et al. by *Rex E. Lee, Carter G. Phillips, Jack R. Bierig, Douglas R. Carlson, Linda A. Tomaselli, Harold J. Bressler, Raymond F. Mensing, Jr.,* and *Joseph Onek;* and for the Federation of State Medical Boards of the United States, Inc., by *Robert C. Bass, Jr.*

Briefs of *amicus curiae* were filed for the Board of Medical Quality Assurance of the State of California et al. by *Ellis J. Horvitz, Peter Abrahams, James E. Ludlam,* and *David E. Willett;* and for the Central and South West Corporation by *Jeffrey H. Howard* and *Ferd. C. Meyer, Jr.*

located in the northwest corner of the State. The only hospital in Astoria is the Columbia Memorial Hospital (CMH). Astoria also is the home of a private group-medical practice called the Astoria Clinic. At all times relevant to this case, a majority of the staff members at the CMH were employees or partners of the Astoria Clinic.

Petitioner Timothy Patrick is a general and vascular surgeon. He became an employee of the Astoria Clinic and a member of the CMH's medical staff in 1972. One year later, the partners of the Clinic, who are the respondents in this case,[1] invited petitioner to become a partner of the Clinic. Petitioner declined this offer and instead began an independent practice in competition with the surgical practice of the Clinic. Petitioner continued to serve on the medical staff of the CMH.

After petitioner established his independent practice, the physicians associated with the Astoria Clinic consistently refused to have professional dealings with him. Petitioner received virtually no referrals from physicians at the Clinic, even though the Clinic at times did not have a general surgeon on its staff. Rather than refer surgery patients to petitioner, Clinic doctors referred them to surgeons located as far as 50 miles from Astoria. In addition, Clinic physicians showed reluctance to assist petitioner with his own patients. Clinic doctors often declined to give consultations, and Clinic surgeons refused to provide backup coverage for patients under petitioner's care. At the same time, Clinic physicians repeatedly criticized petitioner for failing to obtain outside consultations and adequate backup coverage.

In 1979, respondent Gary Boelling, a partner at the Clinic, complained to the executive committee of the CMH's medical staff about an incident in which petitioner had left a patient in the care of a recently hired associate, who then left the

---

[1] Petitioner originally named all of the partners of the Astoria Clinic as defendants. One partner, however, was dismissed from the suit at the close of petitioner's case at trial.

patient unattended. The executive committee decided to refer this complaint, along with information about other cases handled by petitioner, to the State Board of Medical Examiners (BOME). Respondent Franklin Russell, another partner at the Clinic, chaired the committee of the BOME that investigated these matters. The members of the BOME committee criticized petitioner's medical practices to the full BOME, which then issued a letter of reprimand that had been drafted by Russell. The BOME retracted this letter in its entirety after petitioner sought judicial review of the BOME proceedings.

Two years later, at the request of respondent Richard Harris, a Clinic surgeon, the executive committee of the CMH's medical staff initiated a review of petitioner's hospital privileges. The committee voted to recommend the termination of petitioner's privileges on the ground that petitioner's care of his patients was below the standards of the hospital. Petitioner demanded a hearing, as provided by hospital bylaws, and a five-member ad hoc committee, chaired by respondent Boelling, heard the charges and defense. Petitioner requested that the members of the committee testify as to their personal bias against him, but they refused to accommodate this request. Before the committee rendered its decision, petitioner resigned from the hospital staff rather than risk termination.[2]

During the course of the hospital peer-review proceedings, petitioner filed this lawsuit in the United States District Court for the District of Oregon. Petitioner alleged that the partners of the Astoria Clinic had violated §§ 1 and 2 of the Sherman Act, ch. 647, 26 Stat. 209, 15 U. S. C. §§ 1, 2. Specifically, petitioner contended that the Clinic partners had

---

[2] The court below did not address any issues arising from petitioner's decision to resign from the hospital staff prior to the ad hoc committee's determination, and respondents did not raise this matter in their response to the petition for certiorari. Accordingly, we do not address the significance, if any, of petitioner's resignation.

initiated and participated in the hospital peer-review proceedings to reduce competition from petitioner rather than to improve patient care. Respondents denied this assertion, and the District Court submitted the dispute to the jury with instructions that it could rule in favor of petitioner only if it found that respondents' conduct was the result of a specific intent to injure or destroy competition.

The jury returned a verdict against respondents Russell, Boelling, and Harris on the § 1 claim and against all of the respondents on the § 2 claim. It awarded damages of $650,000 on the two antitrust claims taken together. The District Court, as required by law, see 15 U. S. C. § 15(a), 38 Stat. 731, trebled the antitrust damages.

The Court of Appeals for the Ninth Circuit reversed. 800 F. 2d 1498 (1986). It found that there was substantial evidence that respondents had acted in bad faith in the peer-review process.[3] The court held, however, that even if respondents had used the peer-review process to disadvantage a competitor rather than to improve patient care, their conduct in the peer-review proceedings was immune from antitrust scrutiny. The court reasoned that the peer-review activities of physicians in Oregon fall within the state-action exemption from antitrust liability because Oregon has articulated a policy in favor of peer review and actively supervises the peer-review process.[4] The court therefore

---

[3] Viewing the evidence in the light most favorable to petitioner, as appropriate in light of the verdicts rendered by the jury, the Court of Appeals characterized respondents' conduct as "shabby, unprincipled and unprofessional." 800 F. 2d, at 1509.

[4] The Court of Appeals also determined that respondent Russell's activities as a member of the BOME likewise were immune from antitrust liability under the state-action doctrine. As we read the petition for writ of certiorari in this case, petitioner has declined to challenge this holding of the Court of Appeals. Indeed, petitioner asserts that this holding makes no difference to him because he suffered little or no damage from the BOME proceedings or respondent Russell's participation therein. Be-

reversed the judgment of the District Court as to petitioner's antitrust claims.

We granted certiorari, 484 U. S. 814 (1987), to decide whether the state-action doctrine protects respondents' hospital peer-review activities from antitrust challenge.[5] We now reverse.

## II

In *Parker* v. *Brown*, 317 U. S. 341 (1943), this Court considered whether the Sherman Act prohibits anticompetitive actions of a State. Petitioner in that case was a raisin producer who brought suit against the California Director of Agriculture to enjoin the enforcement of a marketing plan adopted under the State's Agricultural Prorate Act. That statute restricted competition among food producers in the State in order to stabilize prices and prevent economic waste. Relying on principles of federalism and state sovereignty, this Court refused to find in the Sherman Act "an unexpressed purpose to nullify a state's control over its officers and agents." *Id.*, at 351. The Sherman Act, the Court held, was not intended "to restrain state action or official action directed by a state." *Ibid.*

Although *Parker* involved a suit against a state official, the Court subsequently recognized that *Parker*'s federalism ra-

cause petitioner has not brought this aspect of the Court of Appeals' decision before us, we express no view as to its correctness.

[5] The petition for certiorari also presented the question whether, assuming that respondent Russell's activities as a member of the BOME constitute state action and thus cannot directly form the basis for antitrust liability, evidence of those activities is admissible insofar as it indicates the presence of a nonimmune conspiracy in which Russell and others engaged. A close reading of the opinion below, however, reveals that the Court of Appeals did not address this question. This Court usually will decline to consider questions presented in a petition for certiorari that have not been considered by the lower court. See, *e. g., Youakim* v. *Miller,* 425 U. S. 231, 234 (1976) *(per curiam).* We see no reason to depart from this practice in the case at bar. Accordingly, we take no position on the evidentiary question raised by petitioner.

tionale demanded that the state-action exemption also apply in certain suits against private parties. See, *e. g., Southern Motor Carriers Rate Conference, Inc.* v. *United States,* 471 U. S. 48 (1985). If the Federal Government or a private litigant always could enforce the Sherman Act against private parties, then a State could not effectively implement a program restraining competition among them. The Court, however, also sought to ensure that private parties could claim state-action immunity from Sherman Act liability only when their anticompetitive acts were truly the product of state regulation. We accordingly established a rigorous two-pronged test to determine whether anticompetitive conduct engaged in by private parties should be deemed state action and thus shielded from the antitrust laws. See *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.,* 445 U. S. 97 (1980). First, "the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy.'" *Id.,* at 105, quoting *Lafayette* v. *Louisiana Power & Light Co.,* 435 U. S. 389, 410 (1978) (opinion of BRENNAN, J.). Second, the anticompetitive conduct "must be 'actively supervised' by the State itself." *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc., supra,* at 105, quoting *Lafayette* v. *Louisiana Power & Light Co., supra,* at 410 (opinion of BRENNAN, J.). Only if an anticompetitive act of a private party meets both of these requirements is it fairly attributable to the State.

In this case, we need not consider the "clear articulation" prong of the *Midcal* test, because the "active supervision" requirement is not satisfied. The active supervision requirement stems from the recognition that "[w]here a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State." *Hallie* v. *Eau Claire,* 471 U. S. 34, 47 (1985); see *id.,* at 45 ("A private party . . . may be presumed to be acting primarily on his or its own behalf"). The requirement is designed to ensure

that the state-action doctrine will shelter only the particular anticompetitive acts of private parties that, in the judgment of the State, actually further state regulatory policies. *Id.*, at 46–47. To accomplish this purpose, the active supervision requirement mandates that the State exercise ultimate control over the challenged anticompetitive conduct. Cf. *Southern Motor Carriers Rate Conference, Inc.* v. *United States, supra,* at 51 (noting that state public service commissions "have and exercise ultimate authority and control over all intrastate rates"); *Parker* v. *Brown, supra,* at 352 (stressing that a marketing plan proposed by raisin growers could not take effect unless approved by a state board). The mere presence of some state involvement or monitoring does not suffice. See *324 Liquor Corp.* v. *Duffy,* 479 U. S. 335, 345, n. 7 (1987) (holding that certain forms of state scrutiny of a restraint established by a private party did not constitute active supervision because they did not "exer[t] any significant control over" the terms of the restraint). The active supervision prong of the *Midcal* test requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy. Absent such a program of supervision, there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests.

Respondents in this case contend that the State of Oregon actively supervises the peer-review process through the State Health Division, the BOME, and the state judicial system. The Court of Appeals, in finding the active supervision requirement satisfied, also relied primarily on the powers and responsibilities of these state actors. Neither the Court of Appeals nor respondents, however, have succeeded in showing that any of these actors reviews—or even could review—private decisions regarding hospital privileges to determine whether such decisions comport with state regulatory policy and to correct abuses.

Oregon's Health Division has general supervisory powers over "matters relating to the preservation of life and health," Ore. Rev. Stat. § 431.110(1) (1987), including the licensing of hospitals, see § 441.025, and the enforcement of health laws, see §§ 431.120(1), 431.150, 431.155(1). Hospitals in Oregon are under a statutory obligation to establish peer-review procedures and to review those procedures on a regular basis. See §§ 441.055(3)(c), (d). The State Health Division, exercising its enforcement powers, may initiate judicial proceedings against any hospital violating this law. See §§ 431.150, 431.155. In addition, the Health Division may deny, suspend, or revoke a hospital's license for failure to comply with the statutory requirement. See § 441.030(2). Oregon law specifies no other ways in which the Health Division may supervise the peer-review process.

This statutory scheme does not establish a state program of active supervision over peer-review decisions. The Health Division's statutory authority over peer review relates only to a hospital's procedures;[6] that authority does not encompass the actual decisions made by hospital peer-review committees. The restraint challenged in this case (and in most cases of its kind) consists not in the procedures used to terminate hospital privileges, but in the termination of privileges itself. The State does not actively supervise this restraint unless a state official has and exercises ultimate authority over private privilege determinations. Oregon law does not give the Health Division this authority: under the statutory scheme, the Health Division has no power to review private peer-review decisions and overturn a decision that fails to accord with state policy. Thus, the activities of the Health

---

[6] Indeed, the statutory scheme indicates that the Health Division has only limited power over even a hospital's peer-review procedures. The statute authorizes the Health Division to force a hospital to comply with its obligation to establish and regularly review peer-review procedures, but the statute does not empower the Health Division to review the quality of the procedures that the hospital adopts.

Division under Oregon law cannot satisfy the active supervision requirement of the state-action doctrine.

Similarly, the BOME does not engage in active supervision over private peer-review decisions. The principal function of the BOME is to regulate the licensing of physicians in the State. As respondents note, Oregon hospitals are required by statute to notify the BOME promptly of a decision to terminate or restrict privileges. See Ore. Rev. Stat. § 441.820(1) (1987). Neither this statutory provision nor any other, however, indicates that the BOME has the power to disapprove private privilege decisions. The apparent purpose of the reporting requirement is to give the BOME an opportunity to determine whether additional action on its part, such as revocation of a physician's license, is warranted.[7] Certainly, respondents have not shown that the BOME in practice reviews privilege decisions or that it ever has asserted the authority to reverse them.

The only remaining alleged supervisory authority in this case is the state judiciary. Respondents claim, and the Court of Appeals agreed, that Oregon's courts directly review privilege-termination decisions and that this judicial review constitutes active state supervision. This Court has not previously considered whether state courts, acting in their judicial capacity, can adequately supervise private conduct for purposes of the state-action doctrine. All of our prior cases concerning state supervision over private parties have involved administrative agencies, see, *e. g., Southern Motor Carriers Rate Conference, Inc.* v. *United States,* 471

---

[7] The statutory provision requiring hospitals to inform the BOME of a decision to terminate privileges is only one of several statutory reporting requirements involving the BOME. Oregon law also provides that hospitals and licensees shall report medically incompetent conduct to the BOME. See Ore. Rev Stat. § 677.415(2) (1987). Further, malpractice insurers must report all medical malpractice claims to the BOME. See § 743.770. All of these reporting requirements appear designed to ensure that the BOME will learn of instances of substandard medical care so that it can decide whether official action is warranted.

U. S. 48 (1985), or State Supreme Courts with agency-like responsibilities over the organized bar, see *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977). This case, however, does not require us to decide the broad question whether judicial review of private conduct ever can constitute active supervision, because judicial review of privilege-termination decisions in Oregon, if such review exists at all, falls far short of satisfying the active supervision requirement.

As an initial matter, it is not clear that Oregon law affords any direct judicial review of private peer-review decisions. Oregon has no statute expressly providing for judicial review of privilege terminations. Moreover, we are aware of no case in which an Oregon court has held that judicial review of peer-review decisions is available. The two cases that respondents have cited certainly do not hold that a physician whose privileges have been terminated by a private hospital is entitled to judicial review. In each of these cases, the Oregon Supreme Court assumed, but expressly did not decide, that a complaining physician was entitled to the kind of review he requested. See *Straube* v. *Emanuel Lutheran Charity Board*, 287 Ore. 375, 383, 600 P. 2d 381, 386 (1979) ("We have assumed (but not decided) for the purpose of this case that plaintiff is entitled to 'fair procedure' as a common law right"); *Huffaker* v. *Bailey*, 273 Ore. 273, 275, 540 P. 2d 1398, 1399 (1975) ("In view of our conclusion that petitioner cannot prevail even assuming the case is properly before us, we find it unnecessary to decide these interesting questions [of reviewability]. Therefore, we assume, but do not decide, that the hospital's decisions are subject to review by mandamus . . .").

Moreover, the Oregon courts have indicated that even if they were to provide judicial review of hospital peer-review proceedings, the review would be of a very limited nature. The Oregon Supreme Court, in its most recent decision addressing this matter, stated that a court "should [not] decide the merits of plaintiff's dismissal" and that "[i]t would be

unwise for a court to do more than to make sure that some sort of reasonable procedure was afforded and that there was evidence from which it could be found that plaintiff's conduct posed a threat to patient care." *Straube* v. *Emanuel Lutheran Charity Board, supra*, at 384, 600 P. 2d, at 386. This kind of review would fail to satisfy the state-action doctrine's requirement of active supervision. Under the standard suggested by the Oregon Supreme Court, a state court would not review the merits of a privilege termination decision to determine whether it accorded with state regulatory policy. Such constricted review does not convert the action of a private party in terminating a physician's privileges into the action of the State for purposes of the state-action doctrine.

Because we conclude that no state actor in Oregon actively supervises hospital peer-review decisions, we hold that the state-action doctrine does not protect the peer-review activities challenged in this case from application of the federal antitrust laws. In so holding, we are not unmindful of the policy argument that respondents and their *amici* have advanced for reaching the opposite conclusion. They contend that effective peer review is essential to the provision of quality medical care and that any threat of antitrust liability will prevent physicians from participating openly and actively in peer-review proceedings. This argument, however, essentially challenges the wisdom of applying the antitrust laws to the sphere of medical care, and as such is properly directed to the legislative branch. To the extent that Congress has declined to exempt medical peer review from the reach of the antitrust laws,[8] peer review is immune from antitrust scru-

---

[8] Congress in fact insulated certain medical peer-review activities from antitrust liability in the Health Care Quality Improvement Act of 1986, 42 U. S. C. § 11101 *et seq.* (1982 ed., Supp. IV). The Act, which was enacted well after the events at issue in this case and is not retroactive, essentially immunizes peer-review action from liability if the action was taken "in the reasonable belief that [it] was in the furtherance of quality health care." § 11112(a). The Act expressly provides that it does not change other "immunities under law," § 11115(a), including the state-action immunity, thus

tiny only if the State effectively has made this conduct its own. The State of Oregon has not done so. Accordingly, we reverse the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE BLACKMUN took no part in the consideration or decision of this case.

---

allowing States to immunize peer-review action that does not meet the federal standard. In enacting this measure, Congress clearly noted and responded to the concern that the possibility of antitrust liability will discourage effective peer review. If physicians believe that the Act provides insufficient immunity to protect the peer-review process fully, they must take that matter up with Congress.