**AGRITRONICS CORPORATION, and Farm Dairy Records, Ltd., Plaintiffs,**

**v.**

**NATIONAL DAIRY HERD ASSOCIATION, INC., Northeast Dairy Herd Improvement Association, Inc., Ohio Dairy Herd Improvement Cooperative, Inc, Pennsylvania Dairy Herd Improvement Association, Inc., and Vermont Dairy Herd Improvement Association, Inc., Defendants.**

No. 94–CV–0066.

United States District Court, N.D. New York.

Feb. 1, 1996.

Hinman, Howard Law Firm, Albert J. Millus, Binghamton, NY and Kohn, Nast Law Firm, Lindsey B. Slaughter, Philadelphia, PA and Weinstein, Kitchenoff Law Firm, David H. Weinstein, Esq. Robert S. Kitchenoff, Philadelphia, PA, for Plaintiffs.

Office of Richard Grace, Richard J. Grace, Binghamton, New York, Shumaker, Loop

Law Firm, Michael M. Briley, David W. Wicklund, Toledo, OH, for Defendants Nat'l DHIA and Ohio DHIC.

Office of Richard Grace, Richard J. Grace, Binghamton, New York and Paley, Rothman Law Firm, Daniel S. Koch, Bethesda, MD, for Defendant Vt DHIA.

Office of Richard Grace, Richard J. Grace, Binghamton, New York and Levin, Fishbein Law Firm, Michael D. Fishbein, Philadelphia, PA and Adler, Claraval Law Firm, Robert F. Claraval, Harrisburg, PA, for Defendant Pa DHIA.

Nixon, Hargrave Law Firm, James D. Kole, John Stuart Smith, Rochester, NY, for Defendant NE DHIA.

## MEMORANDUM–DECISION
## and ORDER

McAVOY, Chief Judge.

## I. INTRODUCTION

Plaintiffs Agritronics Corporation and Farm Dairy Records are private, for-profit corporations that recently have entered the milk testing and farm dairy record-keeping business. On January 19, 1994, plaintiffs filed the present action in this Court against defendants Northeast Dairy Herd Improvement Association, Inc., Ohio Dairy Herd Improvement Cooperative, Inc., Pennsylvania Dairy Herd Improvement Association, Inc., Vermont Dairy Herd Improvement Association, Inc., and National Dairy Improvement Association, Inc. Plaintiffs allege that defendants' conduct (1) constitutes a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) constitutes either a conspiracy to monopolize, an attempt to monopolize, or outright monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (3) violates the provisions of the Donnelly Act, N.Y. General Business Law § 340.1; and (4) amounts to "tortious interference with prospective business advantage" under the common law of the State of New York. Plaintiffs seek treble damages, injunctive relief, attorneys' fees and costs.

Four defendants now move for summary judgment pursuant to Fed.R.Civ.P. 56.

Plaintiffs cross-move for summary judgment. The Court heard oral arguments on these motions on October 27, 1995; the following constitutes the Court's findings of fact and conclusions of law with respect to the issues raised.

## II. BACKGROUND

Defendants Northeast Dairy Herd Improvement Association, Inc. ("NE DHIA"), Ohio Dairy Herd Improvement Cooperative, Inc. ("Ohio DHIC"), Pennsylvania Dairy Herd Improvement Association, Inc. ("Pa DHIA"), and Vermont Dairy Herd Improvement Association, Inc. ("Vt DHIA") are cooperative associations whose membership is composed of dairymen engaged in the operation of dairy farms and the production of milk. Each of these "State DHIAs" is a nonprofit corporation without capital stock that issues no dividends. Each of the farmer members of the State DHIAs is entitled to an equal vote concerning the affairs of the associations. The remaining defendant, National Dairy Herd Improvement Association, Inc. ("Nat'l DHIA") is a cooperative association whose affiliate membership is limited to state and regional associations that are farmer controlled, non-profit "cooperative membership organizations," and each of the State DHIAs named as a defendant herein is a member of the National DHIA. Nat'l DHIA also admits "associate members" that have no control over the affairs of the organization.

The principal function of the State DHIAs and National DHIA is to gather and report information on the history and characteristics of dairy animals owned by member dairymen, as well as the milk produced by such animals. This data-collection program is referred to as the National Cooperative Dairy Herd Improvement Program ("NCDHIP"). As set forth in the Complaint, employees of the State DHIAs visit the farms of member dairymen and record information on each cow in the herd. Characteristics such as parentage, age, calving history, feeding, and maintenance conditions are included in this information. The milk produced by each cow is also sampled and weighed to determine data such as the quantity and quality of milk

produced. The testing employees submit information gathered to the State DHIAs. The State DHIAs in turn forward the information to dairy records processing centers ("DRPCs") that are recognized by defendant Nat'l DHIA and operated in accordance with its rules and regulations. Furthermore, the milk samples collected by the State DHIA supervisors are submitted to laboratories certified by Nat'l DHIA and operated under its rules and regulations. These laboratories test and analyze the milk and report the results to the applicable DRPC. The DRPCs then generate reports concerning the information and milk samples submitted.

The State DHIA-generated records are known as the "official" records and are used by farmer members for herd management and to make decisions concerning cost effective herd improvement. In addition, because the value of a dairy animal is determined by its productivity, the State DHIA-generated records are relied upon by third parties, such as artificial insemination companies ("IAs") to determine the value of dairy animals and their reproductive products. Given this fact, it is essential that the "official" information reported by the State DHIAs be as accurate as possible. Defendants have adopted and implemented a wide range of controls designed to assure that the milk production records furnished through them have been generated without fraud, mistake, or any other circumstance that would render their reports inaccurate and unfairly affect the value of a member's dairy animals. One of the many things that State DHIAs have done to help assure the accuracy of the information in the reports has been to rely exclusively on their own employees to visit member farms and collect raw data that is used to make the DHIA record on each cow submitted for test.

Plaintiffs Agritronics Corporation and Farm Dairy Records are private, for-profit corporations that recently have entered what they describe as "the milk testing and farm dairy record-keeping business." On January 19, 1994, plaintiffs filed the present action in this Court complaining that defendants "refused plaintiffs both the opportunity to provide DHIA services and full voting membership in National DHIA" and "refused to permit anyone other than their employees ... to perform dairy records processing services that result in the generation of 'official' DHIA milk production records." Plaintiffs complain that, as a result, they are not able to provide records for existing and potential clients that have the same market acceptance as the records generated by defendants.

Plaintiffs assert four distinct legal theories upon which they claim a right to relief. In Count I of their Complaint, plaintiffs allege that defendants' conduct constitutes a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. In Count II, plaintiffs assert that defendants' conduct constitutes either a conspiracy to monopolize, an attempt to monopolize, or outright monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. In Count III of the Complaint, plaintiffs claim that defendants have violated the provisions of the Donnelly Act, N.Y. General Business Law § 340.1. Finally, in Count IV, plaintiffs posit that defendants' alleged activities amount to "tortious interference with prospective business advantage" under the common law of the State of New York. Plaintiffs seek treble damages, injunctive relief, attorneys' fees and costs.

Four defendants, Nat'l DHIA, Ohio DHIC, Vt DHIA, and NE DHIA, now move for summary judgment pursuant to Fed.R.Civ.P. 56, alleging that (1) defendants are immune from antitrust liability for their participation in the NCDHIP because the program is authorized by federal law; (2) defendants are immune from liability here under the *Noerr–Pennington* doctrine; (3) defendants are immune from liability under the "state action" doctrine; (4) defendants are immune from liability under the Capper–Volstead Act because they are covered by the "agricultural exemptions;" (5) defendant Nat'l DHIA is immune from liability under the Donnelly Act; and (6) defendants have not engaged in activity that violates any antitrust laws. Plaintiffs cross-move for summary judgement in regard to several of defendants' affirmative defenses and in regard to their Sherman Act claims.

## III.  DISCUSSION

### A.  SUMMARY JUDGMENT STANDARDS

▮▮▮ Rule 56(c) provides that the court may grant summary judgment where there are no genuine issues of material fact for trial.  Fed.R.Civ.P. 56(c).  If there are no genuine issues, the movant is entitled to judgment as a matter of law.  An issue is *genuine* if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  Thus the moving party must establish that there is no genuine issue of material fact remaining for trial, as any doubt as to the existence of a genuine issue for trial is to be resolved in favor of the non-moving party.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).  *See also Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir.1987) (the court must view the evidence in light most favorable to the party opposing the motion).

▮▮▮ When the movant meets this standard, the opposing party must present sufficient facts to demonstrate that some genuine issues of material fact still exist in order to defeat the movant's motion for summary judgment.  The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts; he must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).  In the context of antitrust litigation "the non-moving party must set forth facts that tend to preclude an inference of permissible conduct."  *Id.* at 587–88, 106 S.Ct. at 1356–57; *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993).

▮▮▮ Several courts have noted that summary disposition of antitrust cases is difficult because of their inherent factual complexity, and because motive and intent are paramount considerations.  *See, e.g., Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Hayden Publishing Co. v. Cox Broadcasting Corp.*, 730 F.2d 64, 68 (2d Cir. 1984).  However, complexity does not mean that summary disposition is thereby precluded or even disfavored in antitrust law.  *Capital Imaging*, 996 F.2d at 541.  Rather, summary judgment may be particularly important in antitrust cases to prevent lengthy and drawn-out litigation that has a chilling effect on competitive market forces.  *Id.*  The present motions are now considered in light of these standards.

### B.  DEFENSES AGAINST MONOPOLY LIABILITY

#### 1.  Federal Law Immunity

Defendants note that 7 U.S.C. § 3318 expressly authorizes the United States Department of Agriculture ("USDA") "to enter into cooperative agreements with governmental and private entities to further its research, extension, and teaching programs in food and agricultural sciences."  (Defs' Reply Mem. Supp.Summ.J. at 20–21.)  Defendants also claim that NCDHIP has in fact been implemented by a cooperative agreement between the USDA, Nat'l DHIA, and the Cooperative Extension Service in each state.  As a result, according to defendants, neither Nat'l DHIA nor its state affiliates can be held liable under the Sherman Act for plaintiffs' alleged exclusion from the NCDHIP, "because the DHIA system is clearly authorized by 7 U.S.C. § 3318."  (Def. Nat'l DHIA's Mem. Supp.Summ.J. at 12.)

▮▮▮ Defendants are correct that the Sherman Act's prohibition against anticompetitive behavior is not applicable to the federal government and its officials acting in their official capacity.  *See, e.g., Rex Sys., Inc. v. Holiday*, 814 F.2d 994, 997 (4th Cir.1987).  Moreover, defendants are correct that "private parties, to the extent they are acting at the direction or with the consent of federal agencies, also fall outside the pale of the act's prohibition."  *Greensboro Lumber Co. v. Georgia Power Co.*, 643 F.Supp. 1345, 1365 (N.D.Ga.1986), *aff'd*, 844 F.2d 1538 (11th Cir. 1988).  The issue here, therefore, is whether

the acts of which plaintiffs complain were, without question, authorized by the federal government through the USDA.

■ To cut to the heart of the matter, the Court finds that, even assuming defendants possess federal law immunity for some of their NCDHIP activities, a genuine issue of material fact exists in regard to whether Nat'l DHIA or the State DHIAs have acted beyond the scope of the NCDHIP program as intended by the federal government. In other words, the Court believes that questions remain as to whether the USDA directed or consented to the DHIAs' exclusionary treatment of private testers such as plaintiffs. Some evidence actually indicates that, rather than dictate who could produce "official" records and who could not, the USDA left the determination up to the DHIAs. In a letter to the California DHIA, the Acting Administrator of the USDA Agricultural Research Service ("ARS") indicated that the ARS "lacks the resources to conduct a quality certification program." Moreover, "[a]ssurance of integrity of records appears to be primarily an industry responsibility." (Pls' App.Vol. II Ex. 31.) On another occasion, the USDA's Acting Assistant Secretary for Science and Education notified the Wisconsin DHIA that he "would accept data from contributors that meet quality certification standards equivalent to the National DHIA Quality Certification Standards." (*Id.*)

Despite this and other evidence offered by plaintiffs, the Court also is not willing to grant their cross-motion for summary judgment striking defendants' federal law defense. The Court believes that, based on all the circumstances, a reasonable jury could still find for either party on the federal law issue through different interpretation of conflicting evidence. The USDA's true intent is a factual issue that should remain within the realm of a jury at this point. Summary judgment on this issue is DENIED for both plaintiffs and defendants.

## 2. State Action Immunity

■ The Supreme Court has clearly established the requirements for antitrust immunity under the "state action" doctrine. In *Parker v. Brown*, 317 U.S. 341, 350–51, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943), the Court held that the Sherman Act did not apply to anticompetitive private or government action if the action was taken pursuant to a state policy intended to supplant competition in that industry. The Court has since ruled that there are two requirements for antitrust immunity under *Parker*. First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy." Second, the policy must be "actively supervised" by the state itself. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980).

■ The Supreme Court recently reaffirmed that "while a State may not confer antitrust immunity on private persons by fiat, it may displace competition with active state supervision if the displacement is both intended by the State and implemented in its specific details." *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 633, 112 S.Ct. 2169, 2176, 119 L.Ed.2d 410 (1992). However, the Court has further developed the *Midcal* test, particularly regarding the second requirement. For example,

[t]he mere presence of some state involvement or monitoring does not suffice.... The active supervision prong of the *Midcal* test requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy. Absent such a program of supervision, there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests.

*Patrick v. Burget*, 486 U.S. 94, 101, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988). In sum, the purpose of the "active supervision" inquiry is

to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties.... [T]he analysis asks whether the State has played a substantial role in determining the specifics of the economic policy. The

question is ... whether the anticompetitive scheme is the State's own....

*Ticor*, 504 U.S. at 634, 112 S.Ct. at 2177.

■ The Court will now address the instant case to determine whether defendant State DHIAs have satisfied the requirements of *Midcal*. The Court initially finds that Vt DHIA has not met its burden because it freely admits that the Vermont Extension Service "lack[s] a formal veto power" over Vt DHIA's administration of the NCDHIP program. (Def. Vt DHIA's Reply Mem.Supp. Summ.J. at 3.) As a result, the state does not "actively supervise" the program to the extent required by *Patrick*, 486 U.S. at 101, 108 S.Ct. at 1663. Thus summary judgment striking defendant Vt DHIA's defense of state action immunity as a matter of law is GRANTED in favor of plaintiffs.

■ Even if Vt DHIA had not made such an admission, the Court still would agree with plaintiffs that the anti-competitive actions taken by Vt DHIA and the other State DHIAs are not covered by the state action immunity doctrine. Plaintiffs and Defendants apparently agree that where the first requirement of *Midcal* is concerned, a state's policy of displacing competition or imposing a restraint must either be set forth explicitly in a state statute, or be a "foreseeable result" of what the statute authorizes. *See City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365, 372–73, 111 S.Ct. 1344, 1350, 113 L.Ed.2d 382 (1991).

The authorities cited by defendants, Ohio Rev.Code.Ann. §§ 3335.35–.36, N.Y.Educ. Law § 5712, and Vt.Stat.Ann. tit. 16, § 2321(3), do not explicitly set forth any policies of displacing competition or imposing economic restraints. Moreover, under the liberal interpretation of "foreseeable" advocated by defendants, it is difficult for the Court to conceive of any action related to the NCDHIP that would not be a "foreseeable result" of what the statutes allegedly authorize. Rather than urge defendants to suppress competition, these statutes merely empower the states to conduct educational programs. They cannot reasonably be read, as defendants seem to argue, to require the state Extension Services to look exclusively to defendants and not to competing private testers for "official" milk testing services.

Even if defendants were able to satisfy the first prong of the *Midcal* test, they would not be able to overcome the second requirement under the strict standards set forth by the Supreme Court in *Patrick* and *Ticor*. Defendants have done little more than allege "[t]he mere presence of some state involvement or monitoring" by the state Extension Services. *Patrick*, 486 U.S. at 101, 108 S.Ct. at 1663. They have not demonstrated that no material issue exists over whether state officials had the power to review each of their specific anticompetitive acts and disapprove those that fail to accord with state policy. *See id.* As examples of the states' "active control" of defendants, Ohio DHIC claims that it acts "pursuant to a memorandum of understanding with The Ohio State University." NE DHIA, for its part, notes that "the College of Agricultural and Life Sciences ... is responsible for the coordination of and cooperation in efforts to maintain and develop the NCDHIP in New York." In sum, the Court finds that plaintiffs have satisfied their respective burden. A reasonable jury could not find that "the *anticompetitive* scheme is the State's own," which would be required for defendants to avoid summary judgment. *Ticor*, 504 U.S. at 635, 112 S.Ct. at 2177 (emphasis added).

For these reasons, defendant's motion for summary judgment based on the state action doctrine is DENIED, and plaintiffs' cross-motion striking defendants' reliance on state action immunity is GRANTED.

**3. Noerr–Pennington Doctrine Immunity**

The basis for the *Noerr–Pennington* doctrine was discussed recently by the Supreme Court in *City of Columbia*, where the Court recounted that

> beginning with *Eastern R.R. President's Conf. v. Noerr Motor Freight, Inc.*, [365 U.S. 127, 141, 81 S.Ct. 523, 531, 5 L.Ed.2d 464 (1961) ], we have developed a corollary to *Parker*: The federal antitrust laws also do not regulate the conduct of private individuals in seeking anticompetitive action from the government.... That a private party's political motives are selfish is irrelevant; "*Noerr* shields from the Sherman

Act a concerted effort to influence public officials regardless of intent or purpose." *United Mine Workers of America v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 [ (1965) ].

*City of Columbia,* 499 U.S. at 379–80, 111 S.Ct. at 1353–54. Defendants argue that the *Noerr–Pennington* doctrine immunizes them from liability for any antitrust violations because, in essence, they have entered into cooperative agreements with the USDA and have interacted with the Policy Board. (*See* Defs' Reply Mem.Supp.Summ.J. at 26; Def. Nat'l DHIA's Mem.Supp.Summ.J. at 15–16.) Under defendants' reasoning, their contact with government entities constituted "attempts to influence governmental administrative actions" or "lobbying efforts" that are protected from the antitrust laws by *Noerr–Pennington.*

▮▮▮ The Court finds, as plaintiffs contend, that the *Noerr–Pennington* doctrine is inapplicable to this litigation. Plaintiffs' primary complaint is that defendants have prohibited private testers from competing in the "official" dairy records market. Even assuming that this alleged exclusionary policy results from the dictates of the USDA—an issue that has not been decided—defendants fail to offer sufficient evidence to permit a trier of fact reasonably to conclude that the policy arose from any "lobbying efforts" by defendants. The *Noerr–Pennington* doctrine "has been applied only to situations involving direct actions made to influence governmental decisionmaking.... *Noerr–Pennington* immunity should not extend to actions occurring in an essentially private context." *Mid–Texas Communications Sys., Inc. v. American Tel. & Tel. Co.,* 615 F.2d 1372, 1382–83 (5th Cir.), *cert. denied sub nom. Woodlands Telecommunications Corp. v. Southwestern Bell Tel. Co.,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980).

The Court finds as a matter of law that defendants cannot rely on the Noerr–Pennington doctrine as a defense in this case. As a result, their motion for summary judgment on this issue is DENIED and plaintiffs' motion for summary judgment is GRANTED.

### 4. Capper–Volstead Act Immunity

▮▮▮ The Capper–Volstead Act, along with other statutes, provides an antitrust exemption for certain "agricultural cooperatives." More specifically,

> [p]ersons engaged in the production of agricultural products ... may act together in associations, corporate or otherwise, ... in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged ... and such associations and their members may make the necessary contracts and agreements to effect such purposes.

7 U.S.C. § 291. The Capper–Volstead Act extends the scope of antitrust exemption granted to agricultural cooperatives by Section 6 of the Clayton Act, 15 U.S.C. § 17, which reads, "Nothing in the antitrust laws shall be construed to forbid the existence and operation of ... agricultural ... organizations, instituted for the purposes of mutual help....." Finally, Section 5 of the Cooperative Marketing Act was enacted for the purpose of making it clear that agricultural cooperatives were free to exchange and disseminate marketing, economic, and agricultural production data among themselves without incurring antitrust liability. 7 U.S.C. § 455.

▮▮▮ As this Court determined in its Memorandum–Decision and Order ("MDO") issued on September 22, 1994, an agricultural cooperative must satisfy two requirements in order to be shielded by the Capper–Volstead Act from antitrust liability. First, the organization claiming to be immunized from liability must be composed of "members" that are "producers of agricultural products" or cooperatives composed of such producers. *See* 7 U.S.C. § 291. Second, such an organization must be involved in the "processing, preparing for market, handling, or marketing" of the agricultural products of its members. *See id.* Despite plaintiffs' protestations to the contrary, it is not always necessary that a cooperative be strictly "one member, one vote." (Pls' Mem.Opp.Summ.J. at 45.) The voting structure is irrelevant if the organization does not pay dividends on stock or member-

ship capital in excess of eight percent. 7 U.S.C. § 291. No evidence here indicates that defendants issue any stock or pay any dividends.

■ In regard to the first immunity requirement, plaintiffs argue that defendants are not entitled to the agricultural exemption because they have non-producer members. They make this argument notwithstanding the MDO of September 22, 1994, in which the Court held that the denomination of an entity as an "associate member" in and of itself is not sufficient for true "membership" status under the statutes unless the title "associate member" carries with it certain rights and privileges. Simply put, associate members with no control over an agricultural cooperative are not true statutory "members" and do not strip the cooperative of its exempt status.

Defendants here have submitted uncontroverted evidence that their membership lists are composed exclusively of producers or, in the case of Nat'l DHIA, producers and "associate members" that exercise no control over the cooperatives' operations. Nat'l DHIA's bylaws dictate that "[t]his Association may admit as Affiliates only producer-controlled cooperative associations and producer-controlled agricultural membership organizations...." (Dukas Aff.Ex. B at 1.) Moreover, while "Associate Members" are permissible, "[t]he Affiliates are *the* Members of this Association and shall be vested with the *sole* authority to vote in the affairs of this Association." (*Id.* (emphasis added).) Among the State DHIAs, NE DHIA's bylaws state, for example, that membership is limited to persons "owning one or more dairy animals" only. (Empet Decl.Ex. B at 1.)

Plaintiffs, on the other hand, have failed to submit evidence that would give rise to a genuine question of material fact as to whether any of defendants' controlling members were not agricultural producers. In their Rule 7(f) statement responding to all of defendants' summary judgment motions, plaintiffs do allege that a genuine issue exists over whether defendant Nat'l DHIA "is ... composed exclusively of cooperative associations (the 'State ... DHIAs') whose membership is composed exclusively of dairymen engaged in the operation of dairy farms and the production of milk." (Pls' Rule 7(f) Stmnt. ¶ 2.) However, plaintiffs do not directly controvert defendant Nat'l DHIA's Rule 7(f) statement that "[o]nly its affiliate [producer] members are entitled to participate in the affairs of the NDHIA and elect its board of directors." (Def. Nat'l DHIA's Rule 7(f) Stmnt. ¶ 4.)

■ Plaintiffs also fail in their opposition Memorandum to present allegations that any controlling member of defendant cooperatives is a non-producer. In fact, plaintiffs do not even mention the State DHIAs' membership and essentially argue only that Nat'l DHIA's policy of admitting associate members is enough to destroy the organization's antitrust protection. (See Pls' Mem. Opp.Summ.J. at 47–49.) But without evidence that non-producers exert control over the operations of defendants, plaintiffs have not satisfied their burden on this issue. As a result, the Court holds that all defendants meet the first requirement for Capper–Volstead Act immunity. They are in fact composed of true "members" that are "producers of agricultural products" or cooperatives composed of such producers. *See* 7 U.S.C. § 291.

Turning now to the second immunity requirement, plaintiffs also allege, despite this Court's previous holding to the contrary, that defendants do not engage in "collectively processing, preparing for market, handling, and marketing in interstate ... commerce" their dairy products. Plaintiffs point to witnesses from each defendant who testified unequivocally that their respective DHIAs neither market, process, prepare, nor handle their members' produce. Plaintiffs also imply that, in order to receive agricultural exemption immunity, a cooperative must do *all* of the stated activities rather than just one. The Court once again finds these argument lacking in merit.

Plaintiffs rely on the opinions of lay witnesses for what essentially are legal conclusions. While the general managers and CEOs of the cooperatives may not believe that they "market" produce under their definitions of the word, most courts would beg to

differ. It is well-settled that the term "marketing" has been defined broadly. For example, the Ninth Circuit in *Treasure Valley Potato Bargaining Assoc. v. Ore–Ida Foods, Inc.*, 497 F.2d 203 (9th Cir.), *cert. denied*, 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974), ruled that

> the term *marketing* is far broader than the word sell. A common definition of "marketing" is this: "The aggregate of functions involved in transferring title and in moving goods from producer to consumer, including *among others* buying, selling, storing, transporting, standardizing, financing, risk bearing, and *supplying market information* " ... We see no reason to give that word a special meaning within the context of the Capper–Volstead Act.

*Id.* at 215 (quoting Webster's New Collegiate Dictionary (1953)) (emphasis in original). The Second Circuit also has chimed in, rejecting any "hyper-technical" reading of the Capper–Volstead Act. *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1040 (2d Cir.1980), *cert. denied*, 454 U.S. 818, 102 S.Ct. 98, 70 L.Ed.2d 88 (1981). *See also Northern California Supermarkets, Inc. v. Central California Lettuce Producers Cooperative*, 413 F.Supp. 984, 990 (N.D.Cal.1976), *aff'd*, 580 F.2d 369 (9th Cir.1978), *cert. denied*, 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979).

█ In the case at bar, the Complaint by its own terms states that defendants are in the business of "testing milk and providing the 'official' milk production records for dairy farmers." As such, each defendant clearly has demonstrated that it is performing a "marketing" function within the meaning of the Cooperative Marketing and Capper–Volstead Acts. Accordingly, each defendant has satisfied the second requirement for antitrust immunity.

█ Despite the preferred treatment given to agricultural producers, the Capper–Volstead Act was not intended to create an absolute shield from antitrust liability for agricultural cooperatives. Farmers and their organizations have been held to lose protection from antitrust attack when they combine with nonproducer "outsiders" to unreasonably restrain trade under Section 1 of the Sherman Act. *See* 15 U.S.C. § 1; *United States v. Borden Co.*, 308 U.S. 188, 204–05, 60 S.Ct. 182, 191, 84 L.Ed. 181 (1939). Nor are farmers immune when they or their cooperative engage in predatory practices directed at restraining trade, or use their legitimately acquired monopoly power in such a manner as to smother competition under Section 2 of the Sherman Act. *See* 15 U.S.C. § 2; *Maryland and Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 465–66, 80 S.Ct. 847, 852–53, 4 L.Ed.2d 880 (1960). Plaintiffs allege that defendants fall within both of these exceptions to the agricultural exemption.

█ Plaintiffs first argue that defendants' contracts with the DRPCs, the AI industry, and other trade associations restrain trade such that defendants should lose their antitrust immunity. As an initial matter, the Court agrees with defendants that merely contracting with non-exempt parties does not destroy defendants' protection. *See* 7 U.S.C. § 291. *Borden* indicates that a cooperative must contract or combine with nonproducers *to unreasonably restrain trade* before the cooperative can face liability. In order to avoid summary judgment, plaintiffs consequently must provide sufficient evidence to raise a genuine issue over whether defendants have contracted with nonproducers to unreasonably restrain trade. Again, this requirement means that plaintiffs "must set forth facts that tend to preclude an inference of permissible conduct." *Capital Imaging*, 996 F.2d at 542.

█ The Court finds that plaintiffs have satisfied their burden. A genuine question of material fact exists in regard to whether defendants have contracted with non-exempt parties in a manner that violates the antitrust laws. Plaintiffs allege, for example, that the DRPCs are forbidden, by contract with defendants, to process records submitted by competitors of the State DHIAs such as plaintiffs. However, only records processed by the DRPCs can receive "official" status and its corresponding benefits. Defendants counter that their contracts with the DRPCs "simply advance the legitimate objectives of having their dairy records pro-

cessed by committed DRPCs." (Defs' Reply Mem.Supp.Summ.J. at 6.) Because they have expended considerable sums developing software used by the DRPCs, defendants argue, plaintiffs should not be allowed to "free-ride" on their investments.

Defendants' essentially claim that they have economic justifications for their anti-competitive actions. However, "[a]n anti-competitive practice may have economic justification, but its use may be undertaken with unlawful intent and in the desire to achieve an unlawful goal." *United States v. Dairymen, Inc.*, 660 F.2d 192, 195 (6th Cir.1981). Furthermore, as the Supreme Court has stated,

> [t]he right of these agricultural producers thus to unite in ... marketing their products, and to make the contracts [that] are necessary for that collaboration, cannot be deemed to authorize any combination or conspiracy with other persons that these producers may see fit to devise. Such a combined attempt of all the defendants ... to control the market finds no justification in ... the Capper–Volstead Act.

*Borden*, 308 U.S. at 204–05, 60 S.Ct. at 191.

Plaintiffs also argue that defendants have engaged in predatory trade practices to the extent that they should lose their antitrust immunity. For example, plaintiffs allege that defendants have coerced their membership, barred access to essential facilities, forbidden private testers from competing within the DHIA system, fixed prices, and prevented private testers from verifying the accuracy of their testing methods. Defendants respond by arguing that these actions, if they have been undertaken at all, do not constitute predatory trade practices. The Court is inclined to agree with plaintiffs that a genuine issue of material fact exists over whether defendants actually engaged in predatory actions. *See Knuth v. Erie–Crawford Dairy Cooperative Assoc.*, 395 F.2d 420, 424 (3d Cir.1968) (no immunity for attempts to restrain competition through discriminatory pricing); *Gulf Coast Shrimpers & Oystermans Assoc v. United States*, 236 F.2d 658, 665 (5th Cir.), *cert. denied*, 352 U.S. 927, 77 S.Ct. 225, 1 L.Ed.2d 162 (1956) (no immunity for coercion of persons to join the cooperative).

For example, price-fixing arrangements typically are a *per se* violation of the Sherman Act unless exempt. *See, e.g., Alexander v. National Farmers Org.*, 687 F.2d 1173, 1183 (8th Cir.1982). Defendant counters that "it is not a violation of the Sherman Act for the members of an agricultural cooperative to carry out the legitimate objectives of their association [that] follow naturally from their attempts to achieve ... voluntary elimination of competition among themselves." (Defs' Reply Mem.Supp. Summ.J. at 11 (citing *Fairdale*, 635 F.2d at 1045).) The *Fairdale* language refers, however, to the elimination of competition in the prices farmers charge to consumers. Here, plaintiffs allege that defendants have fixed dues and fees charged to their *member farmers* at rates higher than necessary. Permitting price-fixing under Capper–Volstead was intended to *benefit* rather than harm producers that organize into cooperatives, so defendants cannot rely on that argument.

In sum, plaintiffs have submitted evidence that defendants entered into exclusive arrangements with the DRPCs, convinced the AI industry to impose restrictions on the sale of semen to dairy farmers not on the "official" test, and conspired with other trade associations to maintain defendants' control over the "official" test, all in violation of Section 1 of the Sherman Act. Plaintiffs also have submitted evidence that defendants engaged in predatory trade practices in violation of Section 2 of the Sherman Act. If all inferences are drawn in a light most favorable to plaintiffs as the non-moving parties, the facts as alleged and as supported by affidavits do indeed tend to preclude an inference of permissible conduct by supporting claims for antitrust violations. Summary judgment on the agricultural exemption issue is DENIED for both plaintiffs and defendants.

### 5. Donnelly Act Claims

Defendant Nat'l DHIA requests that plaintiffs' claim under the Donnelly Act, N.Y.Gen. Bus.Law § 340(1), be dismissed because by its terms, according to defendant, the Donnelly Act "shall not apply to cooperative asso-

ciations, corporate or otherwise, of farmers, gardeners, or dairymen ... nor to contracts, agreements, or arrangements made by such associations." N.Y.Gen.Bus.Law § 340(3). Nat'l DHIA obviously believes it is a "cooperative association of dairymen" and thus is immune from liability. Plaintiffs counter that Nat'l DHIA is not a cooperative association of dairymen, but rather "an association of dairy farmer organizations." (Pls' Mem. Opp.Summ.J. at 69.) In plaintiffs' view, Nat'l DHIA only is exempt from the Donnelly Act to the extent it has entered into contracts or agreements with actual cooperative associations, such as its member affiliates.

■ Both sides in this case appear to have misstated New York law regarding the Donnelly Act. The Court finds that the New York Legislature, in crafting the Donnelly Act, intended to duplicate Congress' agricultural exemptions to the Capper–Volstead Act. Thus the Legislature, like Congress, "intended to exempt from the operation of the antitrust laws only legitimate activities and agreements undertaken to organize and operate the co-operative association and to further the collective sales and marketing of members' products." *New York v. Elmhurst Milk & Cream Co.,* 116 Misc.2d 140, 455 N.Y.S.2d 473, 481 (Sup.Ct.1982). *See also New York v. Wisch,* 58 Misc.2d 766, 296 N.Y.S.2d 882, 888 (Sup.Ct.1969) (exemption intended only "to protect ... co-operatives and their officers and employees from the claim that by their very formation they were violating [the Donnelly Act]").

■ The Court consequently will analyze defendant's Donnelly Act argument just as it analyzed defendants' Capper–Volstead argument. The Court first finds that Nat'l DHIA qualifies as a "cooperative association of dairymen" under N.Y.Bus.Law 340(3). As with Capper–Volstead, Nat'l DHIA is an organization whose true members are cooperative associations composed exclusively of dairymen. The Court will not countenance plaintiffs' argument that what could be called a "cooperative association of cooperative associations of dairymen" lies beyond the scope of Donnelly Act immunity for producer organizations. Second, if all inferences are drawn in a light most favorable to plaintiffs

as the non-moving parties, the facts as alleged and as supported by affidavits may indeed support claims for antitrust violations against defendants. Accordingly, as with Capper–Volstead, a genuine issue of material fact exists over whether the Donnelly Act exemption applies to defendant Nat'l DHIA. Summary judgment for defendant Nat'l DHIA on plaintiffs' Donnelly Act claim is DENIED.

### C. PLAINTIFFS' CROSS–MOTIONS FOR SUMMARY JUDGMENT

To the extent the Court has not addressed plaintiffs' motions for summary judgment on their Sherman Act §§ 1 and 2 claims, the motions are DENIED for two reasons. First, as the Court has already decided, it has yet to be determined whether defendants are immune from antitrust liability under the federal law doctrine, the Capper–Volstead agricultural exemption, and/or the Donnelly Act. Second, as the Court has decided, genuine issues of material fact remain in regard to whether any of defendants actually violated either Section 1 or Section 2 of the Sherman Act.

### IV. CONCLUSION

Defendants' motion for summary judgment is DENIED and plaintiffs' cross-motion for summary judgment is hereby GRANTED IN PART, in that defendants are precluded from relying on their "state action immunity" and *Noerr–Pennington* defenses, and DENIED IN PART.

**IT IS SO ORDERED.**