313 F.3d 685
 Electrical Inspectors, Inc., Plaintiff-Counter-Defendant-Appellant,
v.
Village of East Hills, Village of Roslyn and Village of Oyster Bay Cove, Defendants-Counter-Claimants, Village of Islandia, Alexander Pirnie and New York Board of Fire Underwriters, Defendants-Counter-Claimants-Appellees, Village of Island Park, Village of Brookville, Village of North Hills, Village of Flower Hill, Village of Great Neck, Village of Great Neck Estates, Village of Kings Point, Village of Port Washington North, Village of Sea Cliff, Village of Saddle Rock and Village of Baiting Hollow, Defendants.
 No. 01-9483.
 United States Court of Appeals, Second Circuit. August Term, 2002.
 Argued: June 17, 2002.
 Decided: December 13, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED FRANK AMBROSINO, Reilly, Like, Tenty & Ambrosino, Babylon, N.Y., for Defendant-Counter-Claimant-Appellee Village of Islandia.
 DONALD T. RAVE, JR., Locust Valley, N.Y., for Defendants-Counter-Claimants-Appellees New York Board of Fire Underwriters and Alexander Pirnie.
 RONALD C. BURKE, Brand, Brand & Burke, New York, N.Y., for Plaintiff-Counter-Defendant-Appellant.
 Before: CALABRESI, SACK, and B.D. PARKER, JR., Circuit Judges.
 SACK, Circuit Judge:
 
 
 1
 This appeal requires us to determine whether the state-action immunity doctrine shields a municipality and a private corporation from alleged federal antitrust-law violations resulting from the municipality's conferral upon the corporation of exclusivity in the market for government-required electrical inspection services within the municipality.
 
 
 2
 The defendant Village of Islandia (the "Village") is a municipality located on New York's Long Island. In 1988, the Village adopted a policy of requiring building owners to obtain certificates of occupancy from the Village, and conditioning the issuance of such certificates on the positive results of an electrical wiring inspection conducted by the not-for-profit defendant New York Board of Fire Underwriters (the "Board"). Any property owner who wishes to use or occupy a building is required to submit to and pay the Board for the Board's inspection. The plaintiff, a for-profit corporation that also provides electrical inspection services in the State of New York, brought suit against both the Village and the Board in the United States District Court for the Eastern District of New York alleging that this arrangement resulted in violations of the Sherman Act and other federal and state laws. The district court (Leonard D. Wexler, Judge) concluded that the Village's policy was authorized by an act of the New York State Legislature, and that the actions of the Village and the Board were therefore exempt from the federal antitrust laws under the state-action immunity doctrine. Elec. Inspectors, Inc. v. N.Y. Bd. of Fire Underwriters, 145 F. Supp.2d 271, 279 (E.D.N.Y. 2001) ("EII").
 
 
 3
 We agree with the district court that for purposes of the state-action immunity doctrine, the state authorized the Village to pass the ordinance that gave the Board exclusivity with respect to the performance of wiring inspections in Islandia. We disagree, however, with the district court's holding that this finding is sufficient in itself to support a dismissal of the plaintiff's federal antitrust-law claims. We conclude that such immunity for the Board against the plaintiff's claim for damages, and possibly for the Village against the plaintiff's claim for equitable relief, requires a finding that government officials actively supervised the Board. We therefore vacate the judgment of the district court and remand the case for further proceedings consistent with this opinion.
 
 BACKGROUND
 
 4
 In 1981, the New York State Legislature enacted the Uniform Fire Prevention and Building Code Act (the "Act"), N.Y. Exec. Law § 370 et seq. The Act required the creation of a state-wide uniform fire code for commercial and residential buildings, id. § 377, and it directed New York's various local governments to "administer and enforce the uniform... code," id. § 381(2). To facilitate local governments' carrying out of their enforcement responsibilities, the Act directed the New York Secretary of State to "promulgate rules and regulations prescribing minimum standards for administration and enforcement of the uniform . .. code," id. § 381(1), and gave the Secretary powers to ensure that local governments enforced the code in compliance with the Secretary's regulations, id. § 381(4). The Act required the regulations issued by the Secretary to address, inter alia, the frequency of building inspections and the number and quality of inspectors. Id. § 381(1).
 
 
 5
 Pursuant to the Act, the Secretary issued regulations providing that any property owner who wishes to use or occupy a commercial or residential building must obtain a certificate of occupancy from a local government body. N.Y. Comp. Codes R. & Regs. tit. 19, § 429(c)(1) (repealed 1996). Local governments, in turn, were forbidden from issuing a certificate of occupancy for any building unless a designated officer or agent inspected the building's electrical wiring and certified that it complied with the uniform electrical code. Id. § 429(b)(1) (repealed 1996). Finally, the Secretary's regulations (later withdrawn) authorized local governments to pass resolutions designating those who would conduct such inspections. The specified options were (1) "a designated officer or employee of the city, town, or village"; (2) "an employee or agent of another city, town, or village who is qualified to conduct such inspections"; (3) "a person who is qualified to conduct such inspections ... pursuant to a contract with the city, town, or village"; (4) "an employee or agent of the county who is qualified to conduct such inspection"; and (5) "a competent inspector, designated or approved by the city, town, or village." Id. § 429.2(b)(2)(i)-(iv) (repealed 1996).
 
 
 6
 Pursuant to those regulations and prior to their repeal, on August 4, 1988, the trustees of the Village passed an ordinance resolving that the Village "accepts [the Board] as its only electrical inspecting agency." Thereafter, the Village required all applicants for certificates of occupancy to present proof that the Board had inspected the electrical wiring in their buildings and certified that it complied with the National Electric Code.[1]
 
 
 7
 The Board is a not-for-profit corporation that received its charter from the New York State Legislature in 1867.[2] Its members are ninety-six insurance companies authorized to write fire insurance policies in New York. According to an affidavit submitted by defendant Alexander Pirnie, the Board's former president,[3] the Board engages in two principal activities: It maintains the New York City Fire Patrol, a group of patrolmen who assist New York City's firefighters, and it inspects electrical equipment and issues certificates of compliance with the National Electric Code. Pirnie Aff. ¶¶ 4, 11. Approximately 250 New York municipalities have adopted policies that, like the Village's, effectively require building owners to obtain certificates of compliance from the Board. Id. ¶ 12. The Board charges a fee for inspections to be paid by the property owner.
 
 
 8
 The plaintiff, Electrical Inspectors, Inc., is a for-profit corporation that, like the Board, inspects electrical wiring in commercial and residential properties in New York State and issues certificates of compliance with the National Electric Code. On March 1, 1999, the plaintiff brought this action in the district court against fifteen New York municipalities including the Village; on September 9, 1999, it amended its complaint to name the Board as a defendant. The plaintiff alleged various violations of the Sherman Act, 15 U.S.C. § 1 & 2, the Donnelly Act, N.Y. Gen. Bus. Law § 340(1), its federal due process rights, and its federal and state equal protection rights. According to the amended complaint, the municipalities' policies of conferring monopoly power within their respective boundaries on the Board were unauthorized by state law and had the illegal effect of excluding the plaintiff from local markets for electrical inspection services. Amend. Compl. ¶ 139. The plaintiff also alleged that the Board actively sought and maintained such grants, and abused its exclusive positions by providing low-quality service and by seeking to expand its overall market share by threatening to retaliate in those locations where it has exclusivity against customers who use the plaintiff's services where competition is allowed. Id. ¶¶ 52, 69, 72, 112, 118.[4] The plaintiff sought monetary damages against the Board, and injunctive and declaratory relief against the municipalities, for their asserted violation of the federal antitrust laws.
 
 
 9
 The defendants assert in their answer, inter alia, that they are immune from the plaintiff's federal antitrust-law claims under the state-action doctrine. The plaintiff moved to strike this defense as insufficient pursuant to Federal Rule of Civil Procedure 12(f), and the defendants cross-moved for summary judgment on the federal antitrust law claims.
 
 
 10
 On March 30, 2001, the district court issued a Memorandum and Order denying the plaintiff's motion to strike and granting the defendants' motion for summary judgment. EII, 145 F. Supp.2d at 279. The court held that the municipalities were immune from federal antitrust liability on the grounds that the Act gave them "broad ... authority over a matter integral to public health and safety," and that appointing exclusive agents to conduct required electrical inspections was "a `foreseeable' consequence of the state delegation of authority." Id. at 277-78. The district court then concluded that the municipalities' immunity under the state-action doctrine extended to the Board. "Because the municipal defendants' decisions appointing the Board as exclusive agent are immune from antitrust liability, the Board is similarly immune from antitrust liability as the party receiving those appointments." Id. at 279 (citing Cine 42nd St. Theater Corp. v. Nederlander Org., Inc., 790 F.2d 1032, 1048 (2d Cir.1986)).
 
 
 11
 On September 21, 2001, the plaintiff voluntarily dismissed its federal constitutional claims against the municipal defendants. The district court subsequently issued a judgment dismissing with prejudice the plaintiff's federal antitrust-law claims, and dismissing without prejudice the plaintiff's state-law claims for want of supplemental jurisdiction. The plaintiff now appeals, challenging only the district court's dismissal of its federal antitrust-law claims against the Board and the Village.
 
 DISCUSSION
 I. Standard of Review
 
 12
 We review a district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the non-moving party. Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir.1999), cert. denied, 529 U.S. 1098 (2000). A district court must grant a motion for summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.
 
 II. State-Action Immunity for the Village
 
 13
 The Village regulates the usage of local real estate by requiring all owners of commercial and residential buildings who wish to use or occupy their property to obtain from the Village a certificate of occupancy. In order to do so, for reasons of fire safety, a property owner must, under the Village ordinance, first submit the property to an electrical wiring inspection by the Board, pay the Board's fee, and receive from the Board certification that the wiring complies with the National Electric Code. The plaintiff alleged in its amended complaint that the Village's conferral of such exclusivity on the Board violates, inter alia, the Sherman Act, and sought injunctive and declaratory relief.[5] The Village asserts the affirmative defense that its action was pursuant to state policy and thus was exempt from the federal antitrust laws under the state-action immunity doctrine. The district court agreed with the Village. The plaintiff challenges this holding on appeal.
 
 
 14
 Because the district court granted judgment to the Village on its affirmative defense, neither the standing of the plaintiff under the antitrust laws to make all of the underlying claims it asserts nor the merits of the claims are at issue in this appeal. Our only task with regard to the plaintiff's claims against the Village is to evaluate the district court's conclusion that the Village is immune.
 
 
 15
 A. Immunity for Municipal Economic Regulation
 
 
 16
 In City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365 (1991) ("Omni Outdoor"), the Supreme Court addressed state-action immunity for municipal regulatory schemes. There, the City of Columbia, South Carolina, asserted immunity from a claim under the Sherman Act that its restrictions on the size, location, and spacing of billboards hindered the ability of newcomers to compete in the billboard construction market. Id. at 367-69. The Court began its analysis by noting that under the state-action immunity doctrine established by its decision in Parker v. Brown, 317 U.S. 341 (1943), "the Sherman Act [does] not apply to anticompetitive restraints imposed by the States `as an act of government.'" Omni Outdoor, 499 U.S. at 370 (quoting Parker, 317 U.S. at 352.) The Court explained that the doctrine is grounded in "principles of federalism and state sovereignty." Omni Outdoor, 499 U.S. at 370. Local governments are not sovereign, and so their actions are not automatically immune under Parker. Omni Outdoor, 499 U.S. at 370. Nonetheless, because states sometimes effect regulatory regimes through local government bodies, municipalities may avail themselves of Parker immunity to the extent their actions are "an authorized implementation of state policy." Id.
 
 
 17
 The Court held that municipalities that wish to avail themselves of Parker immunity must show that their regulations were authorized by the state. The requisite showing of authority has two components: First, the municipality must have "authority to regulate"; second, it must have "authority to suppress competition." Id. at 372; accord Hertz Corp. v. City of New York, 1 F.3d 121, 128 (2d Cir.1993) (holding that under Parker a municipality must establish that "the resulting anticompetitive activities are a foreseeable consequence of [a] state delegation" (quoting Cine 42nd St. Theater Corp. v. Nederlander Org., Inc., 790 F.2d 1032, 1043 (2d Cir.1986) ("Cine"))), cert. denied, 510 U.S. 1111 (1994).
 
 
 18
 To determine whether the City of Columbia had "authority to regulate," the Supreme Court looked to the terms of the relevant South Carolina statutes. Omni Outdoor, 499 U.S. at 371. At the same time, the Court held that federal courts, when determining state-action immunity for municipalities, must "adopt a concept of authority broader than what is applied to determine the legality of the municipality's action under state law." Id. at 372. This broader concept of authority is necessary, the Court explained, because a doctrine of state-action immunity that "transform[ed] state administrative review into a federal antitrust job" would undermine "the very interests of federalism [the Parker doctrine] is designed to protect." Id. at 372 (citation omitted). For this reason, the Court held, the inquiry into a municipality's authority to regulate should not be exacting. Id. at 371. The Court went on to decide that language in the South Carolina statute authorizing local governments to regulate the height and size of "structures" constituted sufficient authority for the City of Columbia's billboard regulations. Id. at 372-73 & n. 4. Although the statute also provided that municipal ordinances were valid only if they served "the purpose of promoting health, safety, morals or the general welfare of the community," the Court declined to inquire whether the city's ordinance fulfilled this requirement. Id. at 370 n. 3, 371-73 (citation and internal quotation marks omitted). The Court's decision not to inquire as to whether Columbia's ordinance was actually authorized by state statute suggests that as long as the local enactment is within a broad view of the authority granted by the state, whether it is actually violative of that statute is a question for state authorities, not one of federal antitrust law.
 
 
 19
 With regard to the second component of the inquiry, i.e., whether the City of Columbia had "authority to suppress competition," the Supreme Court began by "reject[ing] the contention that this requirement can be met only if the delegating statute explicitly permits the displacement of competition." Id. at 372. Instead, the Court held, the requirement is met "if suppression of competition is the `foreseeable result' of what the statute authorizes." Id. (quoting Town of Hallie v. City of Eau Claire, 471 U.S. 34, 42 (1985)). The Court then asked whether a logical relationship existed between the purpose of the state statute and its alleged anticompetitive effect, and observed that "[t]he very purpose of zoning regulation is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition, particularly on the part of new entrants." Omni Outdoor, 499 U.S. at 373. On this basis, the Court concluded that suppression of competition was a foreseeable result of the South Carolina statute, and thus that the City of Columbia had met the requirements for immunity for its regulatory scheme. Id. at 374.
 
 
 20
 The Supreme Court's analysis in Omni Outdoor mirrored the approach that this Court had followed in Cine. There we examined the actions of the New York "Urban Development Corporation," or "UDC," a public entity designed by the New York State Legislature "to make the State an active participant in the financing and construction of urban renewal projects." Cine, 790 F.2d at 1036. The UDC purchased theaters in the Times Square area of New York City and then awarded leases on them to private developers, prompting parties whose applications for leases had been rejected to bring suit under the Sherman Act against both the UDC and the winning bidders. Id. at 1037-38. The defendants claimed state-action immunity. Id. at 1038.
 
 
 21
 We began our analysis by holding that because the UDC was a "political subdivision of the state," it was like a municipality for purposes of the Parker doctrine. Cine, 790 F.2d at 1047. We then concluded that in order to qualify for state-action immunity, the UDC was required to "show [1] that it acted pursuant to a clearly expressed state policy and [2] that the resulting antitrust consequences were reasonably contemplated by the state." Id. at 1047-48.
 
 
 22
 With regard to the first component, we found authority for the UDC's actions in language in the UDC's enabling statute that specifically empowered it to purchase, and issue leases on, real property. Id. at 1045. Under the second component, we concluded that harm to some businesses around Times Square was a foreseeable consequence of the creation of an entity whose purpose was to improve a blighted urban area:
 
 
 23
 It is fair to conclude that the legislature contemplated that when it granted power to the UDC to determine what buildings and services would be provided in a particular redeveloped land use project, it knew those choices would affect businesses and residences in that entire area. Such a conclusion is based on common sense. As a result of cultural improvements, rents and property values would increase even though some competitors would be adversely impacted, and some would disappear.
 
 
 24
 Id. at 1047. On this basis, we held that the UDC had shown sufficient state authority for its actions, and thus was immune under the Parker state-action immunity doctrine.
 
 
 25
 B. The New York Act and the Village Ordinance
 
 
 26
 The Village argues that its actions effectively excluding the plaintiff from the market for electrical inspections within its boundaries were authorized by the Act and related regulations issued by the New York Secretary of State. To evaluate the Village's defense, we follow the two-step inquiry set forth and applied in Omni Outdoor and Cine.
 
 
 27
 1. Step One: Authority to Regulate. The Village cites two provisions of the Act for its authority to regulate: § 381, which provides that "every local government shall administer and enforce the uniform fire prevention and building code"; and § 371, which states that "it shall be the public policy of the state of New York" to "[e]ncourage local governments to exercise their full powers to administer and enforce the uniform code." N.Y. Exec. Law §§ 381(2), 371(2)(d). The Village also cites for support the regulations issued pursuant to the Act by New York's Secretary of State.
 
 
 28
 The plaintiff disagrees that the Act confers any new powers on New York municipalities that they do not already have, and argues that the statutory language cited by the Village merely directs local governments to apply to a particular purpose powers arising from other statutory sources. If the plaintiff's interpretation of the Act is correct, then the state-action immunity defense is unavailable because the Village has not identified any other specific statutory source of regulatory power, and the principle is well established that a municipality may not fall back on its general police or "home-rule" powers to immunize anticompetitive regulations. See Cmty. Communications Co. v. City of Boulder, 455 U.S. 40, 56 (1982); Hertz, 1 F.3d at 128.
 
 
 29
 If the Village had only the language of the Act to rely upon, its authority for purposes of the Parker doctrine might be subject to doubt. The cited provisions can be read as no more than a direction to New York State municipalities as to how to act, in contrast with statutory language relied on by municipalities in cases in which they have been held to be immune where a similar direction was coupled with an explicit conferral of regulatory power. See Omni Outdoor, 499 U.S. at 370-71 n. 3 (South Carolina statute providing that "the legislative bod[ies] of cities and incorporated towns may by ordinance regulate ... buildings and other structures"); Cine, 790 F.2d at 1045 (New York statute empowering the UDC "to acquire ... real, personal or mixed property[,] and to sell ... [or] lease ... the same").
 
 
 30
 We conclude, however, that the regulations issued by the Secretary soon after the passage of the state statute make clear that even if the Village's ordinance was not actually authorized by the state statute itself, it was within the broad grant of state authority. The Secretary's regulations authorized municipalities to condition occupation and use of a building on the result of an electrical inspection, and "by resolution provide that such inspection shall be performed by [an] inspector, designated or approved by the ... town." N.Y. Comp. Codes R. & Regs. tit. 19, § 429(b) (repealed 1996). The regulations appeared to interpret the statute to authorize the Village, or at least to authorize the Secretary to authorize the Village, to do precisely that which the Village has done.[6]
 
 
 31
 We think that the Act, combined with the Secretary's apparent interpretation of it, sufficiently demonstrates the Village's broad "authority to regulate" for purposes of state-action immunity. The Village has cited statutory language that, although perhaps ambiguous on the question, can be interpreted as delegating a power to regulate, and it has cited regulations issued by the agency charged with enforcing the statute that confer a power to regulate in plain language. Even though those regulations were subsequently withdrawn, they establish the Village's contention that its action was within the broad authority to regulate granted by the state statute itself. Under the broad concept of authority that principles of federalism compel us to apply, we conclude that these sources are sufficient for purposes of Parker state-action immunity analysis.
 
 
 32
 2. Step Two: Authority to Suppress Competition. We also conclude that the Act and the Secretary's regulations establish the second component of authority that municipalities must show under Parker. The specific anticompetitive harm that the plaintiff alleges results from the Village's actions is the plaintiff's complete exclusion from the market for required electrical inspection services. We think that such exclusion is a foreseeable result of a statute that requires municipalities to enforce a uniform fire code and administrative regulations that condition the issuance of certificates of occupancy upon inspections by town-designated agents. "[C]ommon sense," Cine, 790 F.2d at 1047, indicates that a municipality in the course of enforcing a fire code is likely, for quality control purposes, to limit the set of persons who may issue certificates of compliance, "even though some competitors would be adversely impacted," id. And common experience indicates that municipalities often use their own employees to enforce a variety of public codes, such as food preparation or building codes, thereby effectively conferring upon themselves exclusivity in the market for required inspection services at a cost to private entities that would perform the same services. The Secretary specifically authorized such town-operated monopolies. N.Y. Comp. R. & Regs. tit. 19, § 429.2(b)(I) (repealed 1996). Such a regime also appears to be contemplated by the section of the Act that provides that "[l]ocal governments or counties may charge fees to defray the costs of administration and enforcement," N.Y. Exec. Law § 381(2). Thus, complete exclusion of a potential competitor in the market was foreseeable.
 
 
 33
 The plaintiff argues that even if a town-operated monopoly was foreseeable, the designation of a private party as the party enjoying exclusivity was not. We think, however, that the plaintiff's argument misunderstands the nature of the foreseeability inquiry. Our task in assessing the second component of authority identified in Omni Outdoor is to determine whether the state intended or at least could have contemplated that its policy would result in "suppression of competition." 499 U.S. at 373; accord Cine, 790 F.2d at 1047. Whom the municipality selected as the party exercising exclusivity is at best tangential to the inquiry into the foreseeability of suppression of competition. By definition, the creation of a monopoly suppresses — indeed eliminates — all competition in that locality, and in this sense the degree of suppression is the same whether the party exercising the power arising out of exclusivity is public or private. The foreseeability inquiry requires us to go no further. See Cine, 790 F.2d at 1045-46 (identifying the relevant question as whether the UDC's entry into leases with private parties was foreseeable, and not inquiring into the foreseeability of its selection of any party in particular). We therefore conclude that the suppression of competition resulting from the Village's actions was a foreseeable consequence of what the state authorized.
 
 
 34
 C. The Supervision Issue with Regard to the Village
 
 
 35
 Before we can decide whether the Village is immune from the plaintiff's claims, however, we must confront yet one more issue. The plaintiff argues that for a municipality to be immune under the Parker state-action immunity doctrine, it must show, in addition to state authority for its regulatory scheme, that government officials actively supervise those private parties whom the municipality regulates.
 
 
 36
 Whether a municipality must make such a showing appears to be an open question. The Supreme Court held in Town of Hallie that a municipality need not show that it is supervised by state officials for it to qualify for state-action immunity. 471 U.S. at 46. But the Supreme Court also indicated that "[w]here state or municipal regulation by a private party is involved, ... active state supervision must be shown, even where a clearly articulated state policy exists." Id. at 46 n. 10. This raises the question of whether a failure to show active supervision of a private party can defeat both the municipality's claim of immunity and the private party's, or only the private party's. We are not aware of any decision that squarely addresses this issue.
 
 
 37
 The law regarding the active supervision requirement has developed almost entirely in the context of claims against private parties. We will therefore return to the question of whether the Village's immunity might depend upon a showing that the Board is actively supervised by the Village after we review the plaintiff's claims against the Board.
 
 
 38
 III. The Board's State-Action Immunity Defense
 
 
 39
 The plaintiff alleged in its amended complaint that the Board violated the Sherman Act by willfully seeking and maintaining monopolies in various New York municipalities, and by abusing its monopoly power by providing low-quality service and by attempting to expand its overall market share by threatening retaliatory action against those persons who use the plaintiff's service where competition is allowed. The district court, citing our decision in Cine, held that the municipalities' immunity under the Parker doctrine necessarily also protected the Board: "Because the municipal defendants' decisions appointing the Board as exclusive agent are immune from antitrust liability, the Board is similarly immune from antitrust liability as the party receiving those appointments." EII, 145 F. Supp.2d at 279. The plaintiff argues on appeal that the district court misapplied the law of state-action immunity for private parties.[7] The Board argues that the district court's holding was correct, and in the alternative that under the Noerr-Pennington doctrine, certain allegations by the plaintiff fail to allege an antitrust injury.[8]
 
 
 40
 A. The State-Action Defense for Private Actors
 
 
 41
 There are circumstances under which private parties may avail themselves of the Parker state-action immunity doctrine.
 
 
 42
 The Supreme Court has explained the purpose of extending state-action immunity to private parties thus:
 
 
 43
 The Parker decision was premised on the assumption that Congress, in enacting the Sherman Act, did not intend to compromise the States' ability to regulate their domestic commerce. If Parker immunity were limited to the actions of public officials, this assumed congressional purpose would be frustrated, for a State would be unable to implement programs that restrain competition among private parties. A plaintiff could frustrate any such program merely by filing suit against the regulated private parties, rather than the state officials who implement the plan. We decline to reduce Parker's holding to a formalism that would stand for little more than the proposition that [the plaintiff] sued the wrong parties.
 
 
 44
 S. Motor Carriers Rate Conf., Inc. v. United States, 471 U.S. 48, 56-57 (1985) (footnote omitted) ("Motor Carriers").
 
 
 45
 In California Retail Liquor Dealers Assoc. v. Midcal Aluminum, Inc., 445 U.S. 97, 105 (1980), the Supreme Court established that private parties must satisfy a two-prong test to qualify for state-action immunity. First, the private party must show that the alleged anticompetitive acts were pursuant to a "clearly articulated and affirmatively expressed ... state policy" to displace competition. Id. (citation and internal quotation marks omitted). Second, it must show that its conduct was "actively supervised by the State itself." Id. (citation and internal quotation marks omitted).
 
 
 46
 More recently, the Supreme Court made clear that the first prong of the Midcal test is not as demanding as the Court's statement of it in Midcal suggests. It does not, for example, require a private party to show "`a specific, detailed legislative authorization' for its challenged conduct." Motor Carriers, 471 U.S. at 64 (quoting Lafayette v. La. Power & Light Co., 435 U.S. 389, 415 (1978)). Rather, "[a]s long as the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure, the first prong of the Midcal test is satisfied." Motor Carriers, 471 U.S. at 64. For example, in Motor Carriers itself, the Court held that a private party accused of horizontal price fixing had satisfied the first prong of Midcal by showing that a state legislature had instructed a state agency to prescribe "just and reasonable" prices, and the agency, in turn, had "exercised its discretion by actively encouraging collective ratemaking." Id. at 63-64.
 
 
 47
 Under the second prong of the Midcal test — active state supervision — a private defendant must show not only that "state officials have ... [the] power" to supervise, but also that those officials "exercise [that] power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." Patrick v. Burget, 486 U.S. 94, 101 (1988). This requirement of official involvement seeks to prevent states from transforming the Parker doctrine, designed to accommodate the states' sovereign interest in regulating commerce, into an unbounded license for the states to issue Sherman Act exemptions to private parties. See Motor Carriers, 471 U.S. at 57 ("Th[e] supervision requirement prevents the State from frustrating the national policy in favor of competition by casting a `gauzy cloak of state involvement' over what is essentially private anticompetitive conduct." (quoting Midcal, 445 U.S. at 106)); Parker, 317 U.S. at 351 ("[A] state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful."). This second part of the Midcal test thus serves as a counterweight to the first because it "ensure[s] that the state-action doctrine will shelter only the particular anticompetitive acts of private parties that, in the judgment of the State, actually further state regulatory policies." Patrick, 486 U.S. at 100-01.[9]
 
 
 48
 The Supreme Court's most recent decision applying the active supervision prong is FTC v. Ticor Title Ins. Co., 504 U.S. 621 (1992). There, the Court held that arrangements whereby states authorized horizontal price fixing among insurance companies, but required the companies to file collective tariffs that state agencies had the option to reject, lacked sufficient state supervision to qualify for immunity. Id. at 639. To fulfill the active supervision prong, the Court held, private parties must prove that state officials "have undertaken the necessary steps to determine the specifics" of the regulatory regime; a mere "negative option" among state agencies to reject prices proposed by private parties is insufficient. Id. at 638-39. "The mere potential for state supervision is not an adequate substitute for a decision by the State." Id. at 638.
 
 
 49
 The Supreme Court followed a similar approach in Patrick, a case that involved an accusation by a physician that a group of his peers had conspired to deprive him of hospital privileges in violation of the Sherman Act. 486 U.S. at 97-98. Although the defendants presented evidence of state policies encouraging physician peer review, the Court rejected their immunity claims because they had failed to show that state actors actively reviewed "private decisions regarding hospital privileges to determine whether such decisions comport[ed] with state regulatory policy and to correct abuses." Id. at 101.
 
 
 50
 Although the Supreme Court has applied the two-part Midcal test in each of its subsequent cases involving an assertion of state-action immunity by a private party, we have twice declined to engage in an independent immunity inquiry for a private party whose alleged anticompetitive conduct was to participate in "concerted" action with a government entity authorized by the state to take such action. Our first decision in this line was Cine, a case which, as discussed in Part II.A., above, involved efforts by a state-created entity, the UDC, to improve the Times Square area by purchasing theaters and then leasing them to developers. Although the Cine plaintiffs asserted that "collusive and monopolistic" pricing policies would result from the coordinated action between the UDC and the private-party defendants, the only anticompetitive conduct alleged by the plaintiffs to be illegal was the private parties' seeking, and the UDC's awarding, long-term leases on theaters. 790 F.2d at 1037-38; see also Cine 42nd St. Theater Corp. v. Nederlander Org., 609 F. Supp. 113, 119 (S.D.N.Y. 1985), aff'd, 790 F.2d 1032 (2d Cir.1986) (setting forth the plaintiffs' contentions). After concluding that the UDC's actions were fully authorized by New York State and therefore immune, we held that such immunity extended automatically to the "private [parties] acting in concert with the UDC." Cine, 790 F.2d at 1048. We explained that "[w]hen the UDC accomplishes its goal in a protected manner, and the participation of private third parties was reasonably contemplated by the legislature, allowing successful tangential attacks on the UDC's activities through suits against the third parties would effectively block the efforts of the UDC." Id.
 
 
 51
 Our second such decision was Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc., 155 F.3d 59 (2d Cir.1998), which involved alleged antitrust-law violations arising from contracts between a state-operated waste-disposal entity and private waste-disposal companies promising to honor each other's exclusive service agreements with various towns. Id. at 63. After concluding that the state agency's actions were authorized under a state statute and thus immune from federal antitrust-law liability, we held, relying on Cine, that the private companies were also immune because "[s]ubjecting them to antitrust liability would effectively block [the state entity's] efforts to carry out its mandate through contracts with private parties." Id. at 74. As in Cine, the only anticompetitive actions allegedly taken by the private-party defendants were those of contracting with the state-created entity. Id. at 71.
 
 
 52
 The Board argues on appeal that the Supreme Court's decision in Ticor and ours in Cine and Wheelabrator stand for the proposition that the active state-supervision test of Midcal is applicable only in horizontal price-fixing cases. We disagree. With regard to Ticor, the Supreme Court did not limit Midcal to any particular form of private anticompetitive conduct, but instead simply cautioned that its holding that the private defendants were not immune "should be read in light of the gravity of the antitrust offense, the involvement of private actors throughout, and the clear absence of state supervision." 504 U.S. at 639. Four years before Ticor, moreover, the Supreme Court, without dissent, applied the active supervision prong in Patrick, a case that had nothing to do with price fixing. 486 U.S. at 100.
 
 
 53
 We think that Cine and Wheelabrator, rather than departing from the logic of Midcal, are consistent with it. Each of the cases in which the Supreme Court or we applied Midcal involved governmental authorization of agreements in restraint of trade by private entities or individuals.[10] The danger posed by such schemes is that granting to private actors "a degree of private regulatory power," Fisher v. City of Berkeley, 475 U.S. 260, 268 (1986) (citation and internal quotation marks omitted), creates a substantial risk of "frustrating the national policy in favor of competition," Motor Carriers, 471 U.S. at 57, by giving them the authority to execute their own anticompetitive schemes. The requirement of active state supervision ensures that anticompetitive acts are driven by the interests of the state, not the private party's own interests. Town of Hallie, 471 U.S. at 47.
 
 
 54
 In Cine, the plaintiff did not allege that the private parties were engaging in their own anticompetitive scheme. The sole allegation in Cine was that private parties benefitted from a reduction in competition by participating in the government's own regulatory scheme, not that the state had delegated any rule-making or regulatory authority to the private parties. 790 F.2d at 1038-39. There was therefore no allegedly anticompetitive act for the state to supervise.
 
 
 55
 In Wheelabrator, the plaintiff alleged only that the state had itself entered into a horizontal agreement with a competitor. 155 F.3d at 62. When the state enters into an anticompetitive agreement for its own financial benefit, there is no risk that the private acts are part of an anticompetitive scheme that is not "the State's own," Ticor, 504 U.S. at 635, and therefore no delegation of governmental authority for the state to actively supervise. Wheelabrator's discussion of Ticor applied only to horizontal agreements between private parties and the state as competitors.
 
 
 56
 Although Wheelabrator did say that "Ticor has no relevance" unless a case involved "price-fixing," 155 F.3d at 74, this statement must be viewed in light of the facts of that case. In the case at bar, the Village granted the Board exclusivity within its borders. The potential in such a scheme for a private actor to pursue its own anticompetitive interests, rather than the government's, is similar to what it would be had the government authorized competitors jointly to set prices, as in Ticor. For example, the plaintiff alleges that the Board threatened to retaliate, in those areas in which it has exclusivity, against those who hire the plaintiff in areas where the plaintiff and the Board compete. If there is evidence that the Village actively supervises the Board's conduct, it may be properly characterized as an "anticompetitive scheme [that is] the State's own." Ticor, 504 U.S. at 635. If not, it may properly be viewed as a "gauzy cloak of state involvement over what is essentially private anticompetitive activity," Motor Carriers, 471 U.S. at 57 (citation and internal quotation marks omitted), advancing the Board's "own interests, rather than the governmental interests of the State," Patrick, 486 U.S. at 100.
 
 
 57
 We are thus of the view that Cine and Wheelabrator do not shed doubt on our conclusion that state-action immunity is available for the Board only if it can satisfy Midcal's two-prong test.
 
 B. The Board's Actions
 
 58
 We now apply the Midcal test to each of the Board's actions that the plaintiff alleges violate the Sherman Act. Perhaps mindful of our observation in United States v. Aluminum Co. of Am., 148 F.2d 416 (2d Cir.1945) (Hand, J.), that a company does not violate the antitrust laws when monopoly is "thrust upon it," id. at 429, the plaintiff does not claim that the Board violated the Sherman Act merely because the Village passed an ordinance according it exclusivity within the Village. Instead, the plaintiff's claim is that the Board actively sought and abused that monopoly power.
 
 
 59
 1. The First Part of the Midcal Test. We concluded in Part II.B., above, that the Village's conferral of exclusivity upon the Board was "an authorized implementation of state policy." Omni Outdoor, 499 U.S. at 370. We think that this holding also satisfies the first prong of the Midcal test for the Board to the extent that the Board's alleged anticompetitive actions were "pursuant" to the grant of exclusivity. Town of Hallie, 471 U.S. at 40. The plaintiff's amended complaint alleges anticompetitive actions by the Board in municipalities other than the Village, suggesting that the first prong of the Midcal test for purposes of these actions would depend on the authority of these other municipalities to confer monopoly powers upon the Board. On appeal, however, the plaintiff has not raised arguments addressing these municipalities' authority as distinct from the Village's, and so we assume that our analysis of the Village's authority applies equally to these other municipalities for the limited purpose of assessing the Board's satisfaction of the first prong of Midcal.
 
 
 60
 The plaintiff also alleges that the Board attempted to monopolize inspections services by seeking government-issued exclusivity. Amend. Compl. ¶¶ 55, 84. Because these actions were not pursuant to state policy, but rather in pursuit of it, they do not appear to qualify for Parker immunity. They may, however, be protected under the Noerr-Penington doctrine. See Omni Outdoor, 499 U.S. at 379-80 (holding that the Supreme Court's decisions in Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961), and Mine Workers v. Pennington, 381 U.S. 657 (1965), establish that "[t]he federal antitrust laws ... do not regulate the conduct of private individuals in seeking anticompetitive action from the government"). We leave any analysis of this issue to the district court in the first instance on remand.
 
 
 61
 The Board's alleged poor service and retaliatory threats within the Village, if they occurred, unlike the Board's alleged action in lobbying for exclusivity, were pursuant to the exclusivity granted to the Board in the sense that the Board's insulation from competition would have lent these actions much of their capacity to harm. We thus conclude that these alleged actions pass the first part of the Midcal test.[11] Further inquiry into whether the Board is immune with respect to them must be conducted under the second part of the Midcal test: whether there was adequate active supervision of the Board.
 
 
 62
 2. The Second Part of the Midcal Test. With respect to the active state supervision part of the Midcal test as applied to the Board's remaining alleged anticompetitive conduct, the Board argues in the alternative that adequate supervision was present. In support, the Board cites an affidavit in which the Village's mayor asserts that the Village's building department "maintained strict controls over the inspections" by "establishing policies as to the manner in which the electrical inspections were carried out ... [,] enforc[ing] the requirement that all inspectors ... possess the appropriate qualifications ... [and] provid[ing] guidance to the inspectors as to how to proceed." Mayor Frank Falco Aff. ¶ 11. The mayor also asserts in his affidavit that the Village could have replaced the Board at any time by resolution had it become dissatisfied with the Board's services. Id. ¶ 16.
 
 
 63
 As we have noted, the district court did not determine whether the Board was actively supervised, holding instead that this part of the Midcal test need not be met. We decline to decide this heavily factual issue in the first instance on the record before us. See Walker v. Jastremski, 274 F.3d 652, 655 (2d Cir.2001). We note that in this context the Village's mere "negative option" to replace the Board at any time is alone likely inadequate supervision, Ticor, 504 U.S. at 638 (noting that supervision must be "active"), and leave to the district court on remand the determination in the first instance of what degree or kind of supervision is adequate and suffices for the Board's assertion of immunity to succeed.
 
 IV. The Village's Immunity — Redux
 
 64
 We now return to the question we left unanswered in Part II.C., above: whether the Village's immunity, like the Board's, depends upon a showing that the Board is actively supervised. As we indicated, we are unaware of an opinion of the Supreme Court or of this Court that has squarely addressed this issue. We note that the Supreme Court has never held that a state's failure to supervise a regulated private party can deprive the state of immunity under Parker, even though such a failure can result in liability for the private party. The federalism-based concerns underlying state immunity from an antitrust action seem to us less pressing in this case than in the immunity cases the Court and we have decided, however, in part because the Village is not a sovereign, and in part because the plaintiff seeks only injunctive and declaratory relief against the Village. An injunction might be an appropriate device for blocking municipal regulatory regimes that result in significant anticompetitive action by private parties and that constitute nothing more than a "gauzy cloak of state involvement." Midcal, 445 U.S. at 106.
 
 
 65
 But the question of the need for an injunction will arise in this case only if the district court ultimately determines that the Board is not actively supervised and thus not immune, and that there has in fact been a violation of the antitrust laws. We therefore decline to decide this issue since it may prove unnecessary to the disposition of the case. If the district court determines on remand that supervision is lacking, that antitrust violations have occurred, and that a damages award against the Board would be inadequate to deter future harms, it may consider for the first time whether the Parker antitrust immunity doctrine would allow an injunction to issue against the Village even though the Village's actions were authorized by the state.
 
 V. Caveat
 
 66
 It bears both repetition and emphasis that we have done no more than decide that, on the record before us, the defendants are not entitled to Parker state-action immunity as a matter of law. Nothing we have said should be read to imply any views as to the plaintiff's standing under the antitrust laws to raise all of the issues with respect to which it pleads in its amended complaint or as to the possible ultimate merits of its legal claims.
 
 CONCLUSION
 
 67
 For the foregoing reasons, we vacate the judgment of the district court, and remand the case for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The National Electric Code is "a model code promulgated by the National Fire Protection Association," Edison Elec. Inst. v. Occupational Safety & Health Admin., 849 F.2d 611, 614 (D.C. Cir.1988), which is "an international nonprofit membership organization," see NFPA Overview, at http://www.nfpa.org/Home/AboutNFPA/NFPAOverview/NFPAOverview.asp (last visited December 12, 2002)
 
 
 [2]
 On April 1, 1930, the New York State Legislature reconstituted and continued the Board "as a body, corporate and politic, in perpetuity."
 
 
 [3]
 The distinction between the Board and Pirnie is not relevant for purposes of this appeal, and our legal conclusions regarding the Board apply equally to Pirnie
 
 
 [4]
 The plaintiff also challenged the legitimacy of the Board's status as a non-profit entity, alleging that the Board's exemption from income taxes enabled it to earn "excess profits" that accrued to the benefit of its for-profit members. Amend. Compl. ¶¶ 45, 113
 
 
 [5]
 The plaintiff does not allege that the Village has created a monopoly in the sense that it forbade property owners from hiring the plaintiff. The plaintiff's allegation is, rather, that the Village's requirement that every owner submit a Board-issued certificate of compliance in order to receive a certificate of occupancy effectively eliminated demand for the plaintiff's services. The implicit assumption, which we have no reason to doubt, is that property owners have little need for additional inspection services once they have obtained a certificate of occupancy
 
 
 [6]
 While, under the principles announced Omni Outdoor, it is not for us as a federal court of appeals to decide on this appeal whether the Village's acts are ultra vires, neither do we decide that had a state court determined that the acts were ultra vires, we would nonetheless conclude that the municipality or the private actor was entitled to state-action immunity
 
 
 [7]
 The plaintiff also argues that the decision of New York Supreme Court, Broome County, in Atlantic-Inland, 126 Misc.2d at 516, 483 N.Y.S.2d at 618, collaterally estops the Board from asserting a state-action immunity defense in this case. The fact pattern of Atlantic-Inland was similar to that of the instant case: An electrical inspection firm, alleging violations of its constitutional rights and New York antitrust law (i.e., the Donnelly Act), sued a municipality that had designated the Board its exclusive provider of required electrical inspections. The Board intervened on the side of the municipality. The court entered judgment against the defendants, holding that "the [municipality's] ordinance is anticompetitive and an unwarranted monopoly in violation of the Donnelly Act."Id. at 517, 483 N.Y.S.2d at 618. Although the court's opinion in Atlantic-Inland does not mention the state-action immunity defense, the plaintiff argues that the Board could have raised the defense in that case, and so its defeat precludes it from raising the defense now.
 The plaintiff's collateral estoppel argument fails as a matter of law. Unlike the federal antitrust laws, the Donnelly Act contemplates no state-action exception. Elec. Inspectors, Inc. v. Village of Lynbrook, 293 A.D.2d 537, 538, 740 N.Y.S.2d 412, 413 (2d Dep't 2002). Thus, even if the Board raised state-action immunity in Atlantic-Inland, rejection of that defense was not necessary to the disposition, and so that case does not preclude the Board from raising the defense here. See Fuchsberg & Fuchsberg v. Galizia, 300 F.3d 105, 109 (2d Cir.2002) (collateral estoppel applies only to issues necessarily resolved in previous proceeding).
 
 
 [8]
 In a supplemental brief that we requested at oral argument, the Board asserted for the first time a defense under the Local Government Antitrust Act of 1984, 15 U.S.C. § 34 et seq. Because the Board did not raise the defense in its principal appellate brief, the Board has abandoned the defense and we do not consider it. See, e.g., Thomas v. Roach, 165 F.3d 137, 146 (2d Cir.1999)
 
 
 [9]
 Municipalities need not show that the state actively supervises them for them to be immune with regard to their own anticompetitive behavior under the Parker doctrine because "there is little or no danger that [a municipality] is involved in a private price-fixing arrangement." Town of Hallie, 471 U.S. at 47 (emphasis in the original). "The only real danger is that [the municipality] will seek to further purely parochial public interests at the expense of more overriding state goals."Id. By way of contrast, when "a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State." Id.
 
 
 [10]
 E.g., Ticor, 504 U.S. at 625-29 (state laws authorizing private title insurers to set insurance rates, and enforcing the rates by law unless state exercised negative option to reject rates); Patrick, 486 U.S. at 95 (state law authorizing horizontal boycotts by doctors); 324 Liquor Corp. v. Duffy, 479 U.S. 335, 342-43 (1987) (state law allowing liquor wholesellers to establish retail prices); Motor Carriers, 471 U.S. at 50-51 (state laws allowing common carriers to jointly propose prices to agency which would enforce them); Midcal, 445 U.S. 97, 99-101 (state law preventing retailers from selling wine below prices established by wine producers for geographic areas)
 
 
 [11]
 The plaintiff also alleges that the Board has sought to improperly extend use of its monopoly power into localities that have not made it the exclusive provider of inspection services, by threatening customers who use plaintiff's services where they are salable with retaliation in those localities in which the Board has been granted exclusivity. Amend. Compl. ¶¶ 69-72. We leave it to the district court on remand to determine in the first instance whether such actions, if they occurred, were without state-action immunity because they were not reasonably foreseeable anticompetitive effects of the authorized implementation of state policy, or otherwise